[No. B212337. Second Dist., Div. Six. Oct. 20, 2009.]

DANE W. ALVIS et al., Plaintiffs and Appellants, v.
COUNTY OF VENTURA, Defendant and Respondent.

COUNSEL

Loeb & Loeb, Anthony Murray, Michael Thurman, Sharon S. Mequet and Daniel J. Friedman for Plaintiffs and Appellants.

Richards, Watson & Gershon, Robert C. Ceccon, Saskia T. Asamura, T. Peter Pierce and Michael F. Yoshiba for Defendant and Respondent.

OPINION

GILBERT, P. J.—This case arises from a massive landslide after heavy rains in La Conchita in January 2005. Plaintiffs suffered injuries or are relatives of persons who died as a result of the slide. Plaintiffs sued the County of Ventura (County) and others. Plaintiffs alleged against the County causes of action for a dangerous condition of public property, nuisance and inverse condemnation. The County moved for summary adjudication on all causes of action except inverse condemnation. The motion rested on the County's design immunity provided in Government Code section 830.6.[1] The trial court granted the County's motion. Plaintiffs dismissed their inverse condemnation cause of action and appealed the judgment arising from the summary adjudication.

---

[1] All statutory references are to the Government Code unless stated otherwise.

Among other things, this case illustrates two significant points:

In summary judgment or adjudication motions, conflicting declarations from experts on opposing sides usually establish a triable issue of fact. But here, an expert's declaration contains statements that conflict with statements he made in a previous report on a material issue. Because the conflict is unexplained, we conclude the declaration does not establish a triable issue of fact.

A change of physical conditions may cause a public entity to lose its design immunity. But here, the public entity approved a design that contemplated the possibility of a specific change of condition. We conclude that if such condition occurs, the public entity retains its immunity.

We affirm.

## FACTS

La Conchita is an unincorporated area of Ventura County. It sits at the bottom of a steep cliff rising 600 feet above it. La Conchita Ranch owned the cliff. Vista Del Rincon, a County road, runs along the cliff's base. The cliff is prone to landslides.

In March 1995, a landslide of approximately 600,000 cubic yards of earth moved down the cliff. The slide buried several houses in La Conchita and 250 linear feet of Vista Del Rincon road. After the landslide, the County posted a warning on each house that La Conchita is a "Geologic Hazard Area" and to "Enter at Your Own Risk."

La Conchita residents, including some of the plaintiffs in this action, petitioned for a writ of mandate to compel the County to remove the debris from the road. Even though the County prevailed, it explored ways to remove the debris without adversely affecting the stability of the landslide.

The County appointed William Britt, a civil engineer in its employ, to oversee the project. The County applied to the Federal Emergency Management Agency (FEMA) for funds to study whether the debris could be safely removed. FEMA's landslide policy limits its participation in the removal of slides only to the minimum necessary to reopen a public facility. FEMA approved the funding but limited the study to debris removal from the road. Britt understood the County could not use the funds to determine whether the cliff, in general, could be stabilized.

In July 1998, the County retained Zeiser Kling Consultants, Inc. (Zeiser), to conduct the study. Zeiser provides consulting services for geology and

geotechnical engineering. Zeiser was "to evaluate the geotechnical constraints associated with removing the landslide debris from Vista Del Rincon Avenue in order to re-open the roadway."

In October 1998, Zeiser issued its 76-page report and concluded that the debris could be safely removed. It provided three alternatives, including a "pile lagging wall." A pile lagging wall consists of a series of steel beams set vertically in the ground with wooden boards (lagging) set horizontally between the steel beams. The wall is designed to drain water from the spaces between the laggings. The report stated: "[I]t should be understood that none of these alternatives are designed to increase the overall stability of the La Conchita landslide mass." The report's appendices contain boring logs, laboratory test results, stability analysis, structural engineering calculations, and cost estimates. In April 1999, FEMA approved funding for the pile lagging wall alternative.

The FEMA category under which funding for the wall was approved is for emergency measures. FEMA intends such emergency measures to be temporary. Plans for the wall, however, do not state that the wall is temporary. One letter from Zeiser to the County refers to the wall as temporary. But there is no evidence the County intended that the wall would be removed.

Before the County issued notices inviting bids, Britt reviewed the plans and specifications prepared by Zeiser. Based on his professional training and experience, Britt concluded that the plans satisfied reasonable designs and engineering practices. The plans bear the professional registration stamps of a geotechnical engineer and a civil engineer from Zeiser.

By October 1999, the County had received bids and was prepared to submit them for approval by the board of supervisors (board). Prior to the public hearing on the approval, a supervisor asked James O'Tousa, a geologist and consultant to the County, to review the matter and report the results directly to Britt.

On October 12, 1999, Britt received a four-page memorandum from O'Tousa. The memorandum identified 14 areas of concern. Chief among the concerns was whether the project would increase the level of hazard for any of the properties at La Conchita.

Britt declared the memorandum raised many questions that had been considered previously, including the question of an increased hazard over the course of several years. Zeiser had spent hundreds of hours investigating the cliff. Britt and Zeiser concluded the debris could be safely removed from the road without affecting the stability of the cliff or increasing the hazard to

neighboring properties. Nevertheless, Britt sent a copy of O'Tousa's memorandum to Zeiser for response.

On October 19, 1999, the project came before the board. Britt submitted a report recommending approval, and the board approved the project.

On October 29, 1999, Zeiser responded to O'Tousa's comments. But O'Tousa and another member of his firm remained unconvinced that their concerns had been considered. They recommended that construction not proceed until their concerns were resolved.

On November 3, 1999, the County distributed a notice to La Conchita residents. The notice stated "[t]he retaining wall will allow the debris removal to occur without adversely affecting the stability of the overall landslide as it currently exists. It is <u>NOT</u> intended to increase the overall stability of the La Conchita landslide mass."

In November 1999, the County retained consultant Fugro West, Inc. (Fugro), to review the documents for the project, including letters exchanged between Zeiser and O'Tousa's firm. In April 2000, Fugro reported to the County. Under the heading, "Effect Of Construction On Landslide Stability," the report stated: "[Zeiser] has provided reduced-scale copies of geologic cross-sections, prepared by others. [Zeiser] uses the slope geometry that is depicted on those cross-sections to conclude that the volume of debris that will be removed to construct the wall is too small to have a material impact on the overall landslide stability. However, an argument could also be made that any removal of slide debris could have a negative impact on the safety factor of the slope. If a more thorough assessment of whether construction of the wall will have a net negative or positive impact on landslide stability is desired, then a quantitative evaluation should be performed."

The quantitative evaluation was not performed. But Samuel Bryant, the engineer who prepared the Fugro report testified: "We took no exceptions to [the County's] input parameters or we couldn't find any issue with their design."

In a memorandum from Britt to the County's interim director of public works dated April 17, 2000, Britt reiterated that the wall was not designed to prevent future landslides or mud flows. Britt added: "We did consult with Zeiser-Kling during design review, and concur that the timber lagging wall will be self-draining because of the open spaces between the timber lagging. Accordingly, we did not require weep holes or internal drainage systems."

Construction on the wall began in May 2000, and was completed in January 2001. The wall was constructed as designed. The wall was between three feet and 18 feet high.

On January 10, 2005, a large landslide occurred at La Conchita. The slide overwhelmed the wall. The slide killed 10 people and destroyed 16 homes. Britt declared that the debris flow was diverted toward La Conchita by a channel created by the 1995 landslide and by topographical features, not the wall.

Michael Alvis was killed in the landslide. On January 26, 2006, his parents and brother filed the instant action against the County and others. The Alvises' complaint alleges causes of action against the County for wrongful death, dangerous condition of public property, nuisance, property damage and inverse condemnation. The Alvises' complaint was consolidated with 22 other complaints (appellants are collectively referred to as "Alvis" herein).

The complaint alleges against the County: "From in or around the year 2000, and continuing to the time of the January 10, 2005 landslide, the County and Does 51–100 negligently planned, placed, constructed and maintained a wall along a portion of Vista del Rincon Drive. The wall constituted a dangerous condition of public property as defined in . . . sections 830 and 835, which created and increased the risk of death and serious injury to occupants of La Conchita, and damage to property in La Conchita, in the event of a landslide or mudslide. Among other things, the wall altered and diverted the course of the mud, soil, rocks and other debris resulting from the 2005 landslide, causing the landslide to strike and kill the persons named in paragraph 41. [¶] Before the wall was constructed, the County and Does 51–1100 had actual and/or constructive knowledge that the wall would constitute a dangerous condition of public property for reasons which include, without limitation, the fact that these defendants were advised by at least one of their consultants that the design of the wall failed to take into account its effect in the event of a landslide or mudslide. The County and Does 51–100 had actual and constructive notice of the dangerous condition of the wall a sufficient time before the 2005 landslide to take measures to protect against or warn of the dangerous condition, but they negligently failed to do so."

The County moved for summary adjudication on all causes of action, except inverse condemnation, on the ground of design immunity.

In support of the County's motion, Britt declared in part: "On October 12, 1999, I received a memorandum from Jim O'Tousa, a geologist who was a consultant for the County. . . . Mr. O'Tousa asked a number of questions relating to the Vista Del Rincon Debris Removal Project. I reviewed Mr. O'Tousa's letter in its entirety [sic] or about the date of the letter. [¶] When I received the memorandum from Mr. O'Tousa, I had been involved in investigating methods to remove debris from Vista Del Rincon for several years. Mr. O'Tousa asked a number of questions which were relevant to the

Project. However, we had considered most of these questions long before we received the memorandum. For example, Mr. O'Tousa asked whether the Vista Del Rincon Debris Removal Project would 'place any properties in La Conchita at a higher level of hazard than is existing now?' Plainly, that was a very important issue to me from the outset. . . . I refused to proceed with the Project until we received the opinion from an engineer that the debris could safely be removed from Vista Del Rincon without threatening adjacent properties. Thus, I had considered the very question raised by Mr. O'Tousa over the course of several years. Zeiser Kling had also spent hundreds of hours investigating the hillside, and it also concluded that the debris could be removed without affecting the stability of the landslide. [¶] Despite the fact that Mr. O'Tousa's memorandum raised many questions which had previously been addressed, I forwarded a copy to Zeiser Kling on October 13, 1999 for its professional review and response as the Project designer. . . . [¶] On October 19, 1999, I appeared before the County Board of Supervisors. . . . As of that date, it was my professional opinion that the Project satisfied reasonable design criteria and reasonable engineering practices, and that the Project, including the plans and specifications for the retaining wall, was properly and reasonably designed in accordance with good engineering practice. That remains my opinion today. [¶] . . . [¶] Despite my belief that the wall was reasonably designed, I continued to investigate the issues raised in Mr. O'Tousa's October 12, 1999 memorandum. On or about October 29, 1999, I received a letter from Zeiser Kling responding to Mr. O'Tousa's comments. . . . I reviewed that letter in its entirety. Zeiser Kling started its letter by stating the assumptions on which the Project was based: (1) The purpose of the pile lagging wall was to allow for the removal of landslide debris from Vista Del Rincon to allow access to the roadway; (2) The pile lagging wall was not intended to affect (either increasing or decreasing) the stability of the active La Conchita landslide, to contain/control surface drainage or to contain/control mud and debris flows; and (3) occurrences such as earthquakes, flooding, mud and/or debris flow events, or reactivation of the La Conchita landslide were not considered in the design of the pile lagging wall alternative. [¶] . . . [¶] In the letter of October 29, 1998, . . . Mr. Kling and Mr. Raymer responded to each of Mr. O'Tousa's questions. They placed their professional registration stamps on the letter. I reviewed that letter in its entirety. Throughout the letter, Mr. Kling and Mr. Raymer repeatedly acknowledge that the wall would not withstand a debris flow. They also stated that if a debris flow occurred, it would be 'channelized in the drainage along the northern boundary of the La Conchita landslide.' [¶] I understand that plaintiffs in this lawsuit have alleged that the Vista Del Rincon wall diverted the January 10, 2005 debris flow. I did not believe the wall would have any significant impact upon a large scale debris flow when I recommended that the Board approve the Project. It is my opinion today that the wall did not have any significant

impact upon a debris flow. [¶] First, there were existing channels. These channels would collect and direct a debris flow. . . . [¶] Second, when I examined the slide area before the wall was constructed, it was my professional opinion that if a debris flow occurred, it would follow the course of the channels created by the 1995 slide. . . . If a debris flow reached the wall, it would have to be an extremely large debris flow which would engulf everything in its path, including the wall. It is my professional opinion, and was my professional opinion at the time the wall was being designed, based on my training and experience, that the wall would have no more than a trivial impact on such a large debris flow. [¶] Third, an examination of photographs of the La Conchita area shows how the debris flow of January 10, 2005 generally followed the channel depicted in Exhibit 9 . . . . [¶] . . . [¶] Fourth, the wall was built to follow the contours of the earth in back of it, so the wall would have minimal impact upon any debris flow. . . . [¶] . . . [¶] On or about December 9, 1999, the County received a letter from Fugro which set forth its opinions. . . . [¶] After I read Fugro's letter, my opinion was that the Project satisfied reasonable design criteria and reasonable engineering practices, and that the Project, including the plans and specifications for the retaining wall, was properly and reasonably designed in accordance with good engineering practice. However, out of an abundance of caution, the County continued to investigate the matter. [¶] On December 9, 1999, Chris A. Hooke of my department forwarded Fugro's letter to Mr. Raymer at Zeiser Kling. . . . Mr. Hooke is a registered civil engineer. In his letter, Mr. Hooke acknowledges that 'Mr. Bryant (of Fugro, Inc.) indicates that [Zeiser Kling's] design is based upon the assumption that the wall is to simply hold the static embankment not a sliding hill. If that is the case, the lateral forces used in design appear adequate.' [¶] . . . [¶] I visited Vista Del Rincon on several occasions after the wall was built, and before the debris flow of January 10, 2005. I also spoke with employees who visited the area. To the best of my knowledge, there were no changed physical conditions which caused me to change my opinion that the wall satisfied reasonable design criteria and reasonable engineering practices. At all times, up to and including January 10, 2005, the wall functioned as intended. I also observed the wall, the slide area and reviewed several aerial photographs showing area after January 10, 2005 slide. Based on my observations, professional training, and experience the wall performed as designed and might have reasonably been expected to perform under the circumstances. [¶] It is my opinion today that the Project satisfied reasonable design criteria and reasonable engineering practices, and that the Project, including the plans and specifications for the retaining wall, was properly and reasonably designed in accordance with good engineering practice."

The County also submitted Hooke's declaration in his capacity as a registered civil engineer and deputy director of the County's transportation

department. Hooke declared that he reviewed the plans and specifications for the wall prior to signing the notice for bids. He also reviewed the correspondence by and between Zeiser, O'Tousa and Fugro. It was and still is his opinion that the wall was properly and reasonably designed in accordance with good engineering practices.

In opposition to the motion, Alvis submitted the declaration of Awtar Singh, Ph.D., a registered geotechnical and civil engineer. Singh declared, in part: "The real problem was that there was no adequate subsurface drainage provided behind the wall. The clayey soil behind the wall became saturated, exerted tremendous forces against the wall and ultimately contributed to the wall's collapse."

Singh declared that the saturated soil behind the wall both created the slide and diverted the debris flow. Singh said he saw water staining on the lagging from the base of the wall up to 16 feet high. He said: "[The wall] had a 'dam effect.' It caused a rise in the groundwater table in the slide mass behind the wall and created a failure zone with a large volume of debris flow. This failure zone was a mass of soil behind the wall containing additional water that the wall did not permit to drain freely, and that was more likely to slide and create a debris flow. The debris flow that did occur as a result, was diverted at a very fast pace further to the east because of the presence of the wall."

Singh opined that reasonable inspections by County engineers would have alerted them that the wall was not draining properly. He said the engineers should have taken remedial measures including drilling weep holes in the wall and installing hydraugers (horizontal drain pipes) for subsurface drainage.

Alvis submitted photographs of the wall taken hours prior to the landslide by La Conchita resident Matthew Gregorchuck. Alvis claims the photographs show the wall was not draining properly. The photographs show water draining through the spaces between the wooden laggings. The wall is standing straight without bulges or other signs of stress.

Alvis also submitted affidavits by two La Conchita residents stating that had they known of O'Tousa's concerns, they would not have been near the wall at the time of the landslide.

The County objected to Singh's declaration on the grounds that its conclusions were without foundation and were contradicted by an earlier report he made. To support its objections, the County submitted an affidavit by David Sykora, Ph.D., a registered civil and geotechnical engineer.

Sykora pointed out Singh's conclusion that the failure zone behind the wall created the debris flow is directly contradicted by Singh's statement in an earlier report. In that report to State Farm Insurance, Singh stated "[f]ailure started as a landslide in the upper reaches and then flowed at a rapid rate down to the developed area below." Sykora also pointed out Singh's conclusion that the wall was both a cause of the landslide and deflected the debris is internally inconsistent. Sykora stated that if "the failure initiated at the wall, the wall would not be standing to deflect the debris."

Sykora declared that Singh failed to address other issues that bring his theories into question. Some of these are: "a. Photographs taken of the wall since construction show sections of wood lagging between piles with staining and some sections without staining, including sections of the wall still standing. . . . If water was indeed dammed up behind the full height of the wall, 100 percent of the lagging below the elevation of retained soil would be stained. Dr. Singh does not explain how several panels of the wall could have barely any staining if water was dammed up behind the entire wall. [¶] b. There is no evidence that excessive water was flowing from the ends of the walls beyond surface water collected and conveyed in the concrete v-ditch behind the wall. I would expect that if the wall was acting as a dam, seepage and springs would form from the ground near the ends of the wall. Dr. Singh has not reported observations of springs or seeps near the ends of the wall. [¶] c. Dr. Singh has not explained how water would perch behind the wall, not seep into the underlying alluvium, and only affect the wall. If 16 feet of water was backed up behind the wall, a substantial amount of that water would seep into the alluvium below the lagging and there would be visible evidence of water seeping beneath the wall and daylighting between the wall and the road. [¶] . . . [¶] h. Dr. Singh's assumed 16 feet of water, combined with the design soil forces, would exert a substantial force on the wall. We estimate that at the tallest section of the wall, the total force acting on the bottom legging assuming that 16 feet of water was dammed up would be nearly 20,000 pounds. I would expect to see some bowing or signs of distress under that loading. Dr. Singh does not appear to consider the implication of having that much force acting on the lagging. [¶] . . . [¶] j. . . . Although Dr. Singh made observations and took numerous samples during his destructive testing program, he did not describe his observations or present any results of laboratory testing of those samples except for one set of strength tests from an unspecified location on an unspecified material."

Finally, Sykora declared there were no accounts of anything that might indicate a worsening condition including bowing of the wood lagging, tilting of the steel soldier piles, loss of wood lagging, water flowing from the ends of and beneath the wall, ground bulging at the toe of the wall, and distortions or misalignment of the concrete v-ditch at the back of the wall.

The trial court granted the County's motion for summary adjudication. Although the order states that the court overruled both parties' evidentiary objections, the order also states: "As for plaintiffs' claims that changed conditions eliminated design immunity and that negligent maintenance occurred, the Court disagrees because the matters asserted by plaintiffs, including drainage and related issues as well as the 'temporary' nature of the wall, were all considered in the design phase of the project. Thus, they were not truly changed conditions or maintenance issues in the sense contemplated by case law. [Citation.] Further for the reasons argued by the County in its reply brief, the Court finds the declaration of Dr. Singh on those issues unconvincing because it consists largely of conclusions without a substantial foundation, is vague and is contradicted in some respects by his prior report written in February of 2005."

The matter proceeded to trial against the County on the remaining cause of action for inverse condemnation. During trial, Alvis dismissed the inverse condemnation action.

## DISCUSSION

### I

#### *Summary Judgment and Adjudication*

Summary judgment is properly granted only if all papers submitted show there is no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The court must draw all reasonable inferences from the evidence set forth in the papers except where such inferences are contradicted by other inferences or evidence that raise a triable issue of fact. (*Ibid.*) In examining the supporting and opposing papers, the moving party's affidavits or declarations are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356].)

The moving party has the initial burden of showing that one or more elements of a cause of action cannot be established. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) Where the moving party has carried that burden, the burden shifts to the opposing party to show a triable issue of material fact. (*Ibid.*) Our review of the trial court's grant of the motion is de novo. (*Id.* at p. 767.)

A party may move for summary adjudication as to one or more causes of action if the party contends the cause of action has no merit. (Code Civ. Proc., § 437c, subd. (f)(2).) The procedure is the same as that for a motion for summary judgment. (*Ibid.*)

Here Alvis's complaint alleges only that the wall altered the course of the landslide. It does not allege the wall was a substantial factor in causing the landslide. Nevertheless, Alvis argues we must not only consider the allegations of the complaint, we must also consider his discovery responses. Alvis claims his discovery responses allege that water, dirt and debris accumulation created pressure on the wall causing or contributing to the cause of the slide.

But the complaint limits the issues to be addressed in defendant's motion for summary judgment. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258 [78 Cal.Rptr.3d 372].) If a plaintiff wishes to expand the issues to be considered, he must seek leave to amend the complaint. (*Ibid.*) Alvis did not seek leave to amend his second amended complaint. In any event, even if we treat the complaint as alleging the wall was a substantial factor in causing the slide, as the following discussion will show, Alvis cannot prevail.

## II

### Singh's Declaration

In attempting to raise a triable issue of fact, Alvis relies largely on Singh's declaration. He claims that the trial court overruled the County's objections that Singh's opinions expressed in his declaration are without foundation and that some of them contradict his prior statements. It is true the trial court makes the general statement at the beginning of its order granting the motion that "the court denies all evidentiary objections of both parties." But Alvis omits to mention that the court later stated in its order: "[F]or the reasons argued by the County in its reply brief, the Court finds the declaration of Dr. Singh on [negligent maintenance and change of circumstances] unconvincing because it consists largely of conclusions without substantial foundation, is vague and is contradicted in some respects by his prior report written in February of 2005." Although the court may have admitted Singh's declaration into evidence over the County's objection, it found the declaration did not constitute substantial evidence so as to raise a triable issue of fact. Alvis does not argue that the trial court's assessment of Singh's declaration is wrong; he simply ignores the assessment.

We review the motion for summary adjudication de novo, and reach the same conclusion as the trial court. Most significantly, Singh's declaration asserts that the slide started at the bottom of the cliff when the wall failed.

This directly contradicts his prior statement in a report to an insurance company that the "[f]ailure started as a landslide in the upper reaches and then flowed at a rapid rate down to the developed area below." This is not a minor point. Singh's statement that the slide started in the upper reaches of the cliff directly undercuts the premise on which his entire declaration is based. Yet, Singh offers no explanation.

In reviewing motions for summary judgment or adjudication, courts have long tended to treat affidavits repudiating previous testimony as not constituting substantial evidence of the existence of a triable issue of fact. (*Advanced Micro Devices, Inc. v. Great American Surplus Lines Ins. Co.* (1988) 199 Cal.App.3d 791, 800 [245 Cal.Rptr. 44]; *Jacobs v. Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1270 [42 Cal.Rptr.2d 906] [rejecting expert's declaration contradicting deposition testimony].)

Singh's prior statement was not in the form of testimony under oath. But the same reasoning applies. We cannot accept as substantial evidence of a triable issue of fact a declaration that directly contradicts the declarant's prior statement, where the contradiction is unexplained. We may not ignore this significant contradiction.

### III

*Design Immunity*

■    Section 830.6 provides design immunity to a public entity. The statute states in part: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor." (*Ibid.*)

"The rationale for design immunity is to prevent a jury from second-guessing the decision of a public entity by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan or design. [Citation.]" (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 69 [109 Cal.Rptr.2d 1, 26 P.3d 332] (*Cornette*).)

■ A public entity claiming design immunity must show three elements: (1) a causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design. (See *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939 [67 Cal.Rptr.2d 454] (*Grenier*).) The first two elements, causation and discretionary approval, may only be resolved as issues of law if the facts are undisputed. (*Id.* at p. 940.) The third element, substantial evidence of reasonableness, requires only evidence of solid value that reasonably inspires confidence. (*Ibid.*) We are not concerned with whether the evidence of reasonableness is undisputed; the statute provides immunity even if the evidence is contradicted. (*Ibid.*)

(a)  *Causal Relationship*

The first question is whether there is undisputed evidence that the accident was caused by a design defect, and not some other cause. (*Grenier, supra,* 57 Cal.App.4th at p. 940.) The County may rely on the allegations of the complaint to establish causation. (See *Fuller v. Department of Transportation* (2001) 89 Cal.App.4th 1109, 1114 [107 Cal.Rptr.2d 823].)

Here the complaint alleges the County negligently "planned, placed, constructed and maintained" a wall and that the wall created an increased risk of injury or death in that it "altered and diverted the course of the mud, soil, rocks and other debris resulting from the 2005 landslide . . . ." The complaint also alleges that the County knew the wall constituted a dangerous condition because it was "advised by at least one of [its] consultants that the design . . . failed to take into account its effect in the event of a landslide or mudslide," and that the County failed to take measures to protect against or warn of the dangerous condition.

Alvis argues that the complaint alleges failure to maintain and failure to warn as grounds for liability independent of the design of the wall. He cites *Cameron v. State of California* (1972) 7 Cal.3d 318, 328–329 [102 Cal.Rptr. 305, 497 P.2d 777], for the proposition that section 830.6 does not immunize for liability caused independent of design, even if the independent negligence is only a concurring proximate cause of the accident.

In an effort to show that lack of maintenance was an independent cause, Alvis relies on Singh's declaration. But Singh's declaration is insufficient to raise a triable issue of fact.

In any event, even if we were to consider Singh's declaration, it would not help Alvis. Singh's suggested "maintenance" of the wall is to drill weep holes in the wall and install hydraugers (horizontal drain pipes). But such changes

and additions to the wall are not maintenance; they are design factors. It is uncontested that Britt considered adding such features when designing the wall, but rejected the idea as unnecessary. In *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 575 [136 Cal.Rptr. 751], the case on which Alvis relies, the maintenance involved was simply unclogging a drainage system. Nothing in *Mozzetti* indicates that "maintenance" includes a change in the design of the structure or the addition of physical features to the structure, such as Singh suggests here.

The photographs taken by Gregorchuck are also insufficient to raise a triable issue of fact. If anything, the photographs appear to support the County. They show water draining through the wall as it was designed to do. The wall is not leaning. There are no bulges or cracks. There is nothing to indicate the wall is under any extraordinary stress. To the contrary, the wall appears solid.

Alvis also claims that the County's failure to warn of a known danger was an independent contributing cause.

The second amended complaint alleges that the County was warned by at least one of its experts that the design failed to take into account the wall's effect in the event of a landslide. The expert alluded to is obviously O'Tousa. But O'Tousa's memorandum did not warn of specific defects, it raised questions for Britt to consider. Alvis points out one of the issues that O'Tousa's memorandum states should be clarified is whether "the wall [would] change existing patterns and stability, i.e., could landslides be diverted away from the project site that would otherwise [have] taken a different path?" But it is uncontested that Britt considered that issue. He determined the landslide would occur in an existing channel, and that the wall would have no substantial effect on its path. It would be difficult for the County to devise a meaningful warning from O'Tousa's suggestions that Britt consider issues which Britt has in fact considered.

In his brief, Alvis suggests the County should have warned that "no one had determined whether the wall would adversely affect the stability of the slope, and that the County's premiere expert on the geology of the slide (O'Tousa) questioned the source of the [County's statement that stability would not be adversely affected] and objected to the project."

But it is undisputed that Zeiser and Britt determined the wall would not adversely affect the stability of the slope. They had no duty to convince O'Tousa. The County is correct that a truthful warning would state: the County's geologic consultant suggested the County consider whether the wall

would adversely affect the stability of the slope, and the County's engineers and its consultant determined it would not. Such a warning would be worthless.

In any event, the County gave warnings. Following the 1995 landslide, the County warned residents and the public that La Conchita is a geologic hazard area; that a landslide could impact the entire community of La Conchita; that a lack of information precludes estimating risk; and that persons enter at their own risk.

Alvis's reliance on a sentence from a notice of public meeting is misdirected. The sentence states that "[t]he retaining wall will allow the debris removal to occur without adversely affecting the stability of the overall landslide as it currently exists." Alvis ignores the second sentence of the notice: "It is NOT intended to increase the overall stability of the La Conchita landslide mass." The notice plainly informs that the slope will not be more stable after the wall is built. Thus the prior notice of geologic hazard remains in effect unabated.

Alvis relies on declarations from two plaintiffs that had they been aware of the concerns of the County's consultants, they would not have been near the wall at the time of the slide. But the warnings the County gave are sufficient to advise any reasonable person to stay away from the area, particularly after days of heavy rains. Alvis cites no authority that requires the County to show that individual plaintiffs received actual notice.

Here the complaint alleges that the design of the wall caused plaintiffs' injuries. There is no substantial evidence of any independent cause. The County has prevailed on the first element of design immunity.

### (b)   *Discretionary Approval*

It is undisputed that the County's board of supervisors exercised their discretion to approve the plans for the project. Alvis argues that the County's exercise of discretion must be knowing or informed. Alvis claims the board could not have made an informed decision because it was unaware of O'Tousa's concerns.

But section 830.6 does not state the approval must be knowing or informed. A court may not rewrite a statute to make it conform to a presumed intent that is not expressed. (*Cornette, supra*, 26 Cal.4th at pp. 73–74.)

Moreover, even if the statute requires a knowing or informed approval, the requirement is met here. The board did not arbitrarily approve the plans for

the wall. The board approved the plans upon recommendation of a registered professional civil engineer backed by other professional consultants. The board is entitled to rely on the recommendations of its staff professionals in making decisions on such technical matters. (See *Grenier, supra,* 57 Cal.App.4th at p. 940 [a detailed plan, drawn by a competent engineering firm, and approved by a city engineer in the exercise of his or her authority, is persuasive evidence of the element of prior discretionary approval].) Alvis points to nothing in section 830.6 that requires the board be informed of every concern raised by a consultant.

Alvis's reliance on *Levin v. State of California* (1983) 146 Cal.App.3d 410 [194 Cal.Rptr. 223], is misplaced. There, the plaintiff veered off a state highway, down a steep embankment and drowned. The design of the road disregarded Caltrans's (California's Department of Transportation) guardrail standards. The trial court granted summary judgment in favor of the state on the ground of design immunity. The Court of Appeal reversed, concluding the state had not satisfied the discretionary approval element. The court stated there was no evidence the official who had the authority to approve the design had the authority to disregard the guardrail standards. (*Id.* at p. 418.) Nor was there evidence the official decided to ignore the standards or considered the consequences of the elimination of an eight-foot shoulder. (*Ibid.*) The court said that "[a]n actual informed exercise of discretion is required," and "[t]he defense does not exist to immunize decisions that have not been made." (*Ibid.*)

Here it is undisputed that Britt considered the effect of the wall on debris diversion and the slope's stability. He concluded there would be no substantial effect. The board approved the wall plans pursuant to Britt's recommendation. Nothing in *Levin* suggests the party making the decision must be informed of negative comments by other consultants or experts. It was simply not an issue in the case.

Nor is *Hernandez v. Department of Transportation* (2003) 114 Cal.App.4th 376 [7 Cal.Rptr.3d 536], of help to Alvis. There, the question was whether the design of an off-ramp was ever approved. Caltrans did not dispute that no " 'project approval document' " for the off-ramp could be located. (*Id.* at p. 381.) *Hernandez* does not concern whether the authority approving the project must be informed of the concerns of other experts.

(c) *Substantial Evidence of Reasonableness*

The final element of design immunity is that there must be substantial evidence supporting the reasonableness of the plan or design. Section 830.6 makes the resolution of this issue a matter of law for the trial or appellate court. (*Cornette, supra,* 26 Cal.4th at p. 72.)

■ Here there is ample evidence to support the reasonableness of the design. The plans bear the professional stamps of a geotechnical engineer and a civil engineer from Zeiser. The plans were approved by Britt, a registered civil engineer. Britt declared that the project had been designed with reasonable professional engineering judgment. Even geotechnical engineer Samuel Bryant of Fugro, whom Alvis seeks to characterize as a dissenting voice, testified in his deposition: "We took no exceptions to their input parameters or we couldn't find any issue with their design." O'Tousa might be considered a dissenter, but he testified in his deposition that he did not review the plans. In any event, section 830.6 provides immunity even if the evidence of reasonableness is contradicted. (*Grenier, supra*, 57 Cal.App.4th at p. 940.)

IV

*Changed Physical Conditions*

Alvis contends there is a triable issue of fact as to whether the County lost its design immunity due to changed physical conditions.

■ A public entity can lose its design immunity where the plan or design in its actual operation becomes dangerous under changed physical conditions. (*Cornette, supra*, 26 Cal.4th at p. 70.) To demonstrate loss of design immunity, a plaintiff must establish three elements: "(1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings." (*Id.* at p. 72.)

Here Alvis claims the changed physical condition is that over time soil clogged the wall causing water to accumulate behind it. He claims the accumulation of water increased the hydrostatic pressure on the back of the wall. As evidence, Alvis points to Singh's declaration. But Singh's declaration is insufficient to raise a triable issue of fact.

In any event, Singh did not purport to have personally observed the wall over a period of time prior to the slide. At best, Singh draws conclusions from observations made after the slide. Persons who actually observed the wall over a period of time prior to the slide tell a different story. Plaintiff Sheila Fry testified she lived across the street from the wall and looked at it constantly. She said at most times there was at least seepage through the wall; there was more when it rained. She said from 2000 to 2005 she did not notice

"any big difference" in the way it was draining. Another plaintiff, Thomas Ray, testified "water was always coming out of the wall." County engineer Hooke declared he visited the wall several times between 2000 and January 2005 and observed "weeping was occurring between the loose wooden lagging of the wall face as it was supposed to . . . ." Alvis fails to point to the testimony of anyone who actually observed the wall over a period of time that would support his claim of a change of conditions. To the contrary, even plaintiffs testified there was no change of condition and that water was always coming out of the wall.

Nor are Gregorchuck's photographs of help to Alvis. They show water draining through the wall and no bulging, leaning or other signs of stress. Moreover, they certainly do not depict a change of conditions.

■ Finally, the claimed change of physical conditions cannot be based on the same technical data or policy decisions that went into the original plan or design. As our Supreme Court stated in *Cornette*: " '[W]here experience has revealed the dangerous nature of the public improvement under changed physical conditions, the trier of fact *will not simply be reweighing the same technical data and policy criteria which went into the original plan or design*. Rather, there will then be objective evidence arising out of the actual operation of the plan—matters which, of necessity, *could not have been contemplated by the government agency or employee who approved the design*. No threat of undue interference with discretionary decision-making exists in this situation.' [Citation.]" (*Cornette, supra*, 26 Cal.4th at p. 73, italics added, quoting *Baldwin v. State of California* (1972) 6 Cal.3d 424, 435 [99 Cal.Rptr. 145, 491 P.2d 1121].)

Here Singh's declaration makes it clear that what he claims is a change of conditions are the same conditions contemplated by the County's consultants at the time the wall was designed. Singh declares: "As the consultants feared, the soil types made it extremely likely that the clayey soils would clog the cracks between the timbers, prevent drainage, and cause a build-up behind the wall of saturated earth and debris. This build-up creates the very 'hydrostatic pressures or seepage forces' against the wall that concerned Fugro . . . . This is the dam effect that concerned Mr. O'Tousa."

It is undisputed that Zeiser and Britt considered the concerns of the County's consultants and rejected the need for any design changes to improve drainage. In particular, Britt's memorandum of April 17, 2000, states he consulted with Zeiser during design review and concurred that the wall would be self-draining. "Accordingly, we did not require weep holes or internal drainage systems." Weep holes and internal drainage systems are precisely the features Singh declared should have been added to the wall.

Even if we were to consider Singh's declaration as substantial evidence, Alvis would not be helped. Singh's declaration shows the alleged change of conditions relates directly to the factors the County considered in making its design choices. It is that sort of second-guessing of the County's design choices that section 830.6 was enacted to prevent. (*Cornette, supra*, 26 Cal.4th at pp. 69, 73.)

The judgment is affirmed. Costs are awarded to respondent.

Yegan, J., and Coffee, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 23, 2009, S178125. George, C. J., and Werdegar, J., did not participate therein.