Filed 1/23/15  Munoz v. Palm Springs Baking Co. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| JOSE DEJESUS MUNOZ, | |
| Plaintiff and Appellant, | E056726 |
| v. | (Super.Ct.No. INC10010154) |
| PALM SPRINGS BAKING COMPANY, INC., | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Harold W. Hopp, Judge.

Affirmed.

Greene, Broillet & Wheeler, Geoffrey S. Wells and Robert D. Jarchi; Esner,

Chang & Boyer and Stuart B. Esner, for Plaintiff and Appellant.

Diederich & Associates and Richard L. Scott for Defendant and Respondent.

Plaintiff and appellant Jose DeJesus Munoz was seriously injured on the job while

cleaning a dough dividing machine.  He initiated this action against his employer, Palm

1

Springs Baking Company, Inc. (PS Baking)[1] pursuant to Labor Code section 4558,[2] the power press exception to the exclusivity provision of the worker's compensation law. PS Baking successfully moved for summary judgment on the ground that the dough dividing machine was not a power press within the meaning of section 4558. Munoz appeals and we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

Munoz was employed as a bakery worker for PS Baking, a wholesale bakery. On March 23, 2010, he was injured while cleaning a Parta U2 Dough Divider machine (dough machine). He filed a worker's compensation claim for his injuries and was receiving payments. PS Baking acquired the dough machine with the purchase of the company from Just Off Melrose in September 1999. At the time of purchase, the dough machine was equipped with three safety interlock switches.

On November 10, 2010, Munoz filed this action, asserting a claim for violation of section 4558 against PS Baking. Munoz alleged that PS Baking "knowingly removed, altered, modified and/or knowingly failed to install a point of operation guard" on the machine, in violation of section 4558, which caused his injuries. PS Baking denied these allegations, responding that it was not subject to section 4558, and thus, Munoz's claim is limited to the exclusive remedy of worker's compensation under sections 3601 and 3602.

---

[1] Munoz also named the manufacturer of the machine; however, this appeal involves only PS Baking.

[2] All further statutory references are to the Labor Code unless otherwise indicated.

On or about January 31, 2012, PS Baking moved for summary judgment. The motion argued that PS Baking could not be held liable for violating section 4558 because the dough machine was not a power press as defined in the statute. Alternatively, PS Baking claimed that it had not removed, bypassed or failed to install a point of operation guard (interlock sensor/switch) on the dough machine. Munoz opposed the motion, arguing that triable issues of fact exist as to whether the dough machine was a power press within the meaning of the statute, and whether PS Baking had disabled or removed a point of operation guard. Both sides offered expert declarations. The trial court agreed with PS Baking and granted summary judgment in its favor. The court overruled both sides' evidentiary objections. Judgment was entered on August 13, 2012, and Munoz appealed.

## II. ANALYSIS

### A. Standard of Review

We review orders granting motions for summary judgment de novo, applying the same rules the trial court was required to apply in deciding the motion. (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 753.)

A defendant moving for summary judgment has the burden of demonstrating as a matter of law, with respect to each of the plaintiff's causes of action, that one or more elements of the cause of action cannot be established, or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) If a defendant's moving papers will support a

3

finding in its favor on one or more elements of the cause of action or on a defense, the burden shifts to the plaintiff to present evidence showing that a triable issue of material fact actually exists as to those elements or the defense. (*Aguilar*, *supra*, at p. 849.) In order to meet that burden, "'[t]he plaintiff . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.'" (*Ibid.* [quoting Code Civ. Proc., former § 437c, subd. (o)(2), now subd. (p)(2)].) Further, the opposing party must produce admissible evidence demonstrating the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subds. (d), (p)(2).) We review a trial court's evidentiary rulings on summary judgment for abuse of discretion. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679.)

## B. The Power Press Exception to the Worker's Compensation Exclusivity Rule

"Where an employee is injured in the course and scope of his or her employment, workers' compensation is generally the exclusive remedy of the employee . . . against the employer. [Citations.] . . . .

"There are, however, limited statutory exceptions to the exclusivity rule . . . . [Citations.] One such exception is found in section 4558, the 'power press exception.' Section 4558 authorizes an injured worker to bring a civil action for tort damages against his or her employer where the injuries were 'proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power

4

press,' where the 'manufacturer [had] designed, installed, required or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer.' [Citation.]" (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 279-280.) However, there is no liability under section 4558 "absent proof that the manufacturer designed, installed, required, or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer." (§ 4558, subd. (c).) A point of operation guard as used in section 4558 "includes any apparatus or device that keeps a worker's hands outside the point of operation while operating a power press." (*Bingham v. CTS Corp.* (1991) 231 Cal.App.3d 56, 59.)

"The obvious legislative intent and purpose in section 4558 is to protect workers from employers who wilfully remove or fail to install appropriate guards on large power tools. Many of these power tools are run by large mechanical motors or hydraulically. [Citation.] These sorts of machines are difficult to stop while they are in their sequence of operation. Without guards, workers are susceptible to extremely serious injuries. For this reason, the Legislature passed section 4558, subdivision (b), which subjects employers to legal liability for removing guards from powerful machinery where the manufacturer has designed the machine to have a protective guard while in operation." (*Ceja v. J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1377 (*Ceja*).) Nevertheless, the "Legislature did not intend *all* workers injured by the absence of a point of operation guard to bring a legal action. Rather, it intended to provide relief only for a specific portion of those employees—workers whose employer knowingly failed to install or

5

removed guards from a machine where the original manufacturer designed the machine to have a protective guard while in operation." (*Jones v. Keppeler* (1991) 228 Cal.App.3d 705, 711.)

## C. Definition of Power Press

Section 4558, subdivision (a)(4), defines a "power press" as "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products." This definition "entails four elements. The power press itself is a machine. It is a machine that forms materials. The formation of materials is effectuated with a die. Finally, the materials being formed with the die are being formed in the manufacture of other products." (*Ceja*, *supra*, 196 Cal.App.3d at p. 1376.) The starting point for our interpretation of the plain language of section 4558 is *Rosales v. Depuy Ace Medical Co.* (2000) 22 Cal.4th 279 (*Rosales*), in which the Supreme Court limited the type of material-forming machines that fell within the section 4558 exception.

In *Rosales*, our state's highest court defined the term "die" as follows: "[T]he term 'die' clearly denotes not *all* material-forming tools, but a subset of such tools. The devices described in dictionary definitions of 'die' generally share two pertinent characteristics. First, they impart form to the material by impact or pressure *against* the material, rather than *along* the material. Second, they impart to the material some version of the die's own shape. The two characteristics are logically related, since the die, acting by impact against the material, can only alter the form of the material where it impacts it, necessarily leaving an impression or cutout of its own shape (unlike a linear cutting blade

6

that, moving along the surface of the material, can be directed to cut out any desired shape). The first characteristic (impact or pressure against or through the material) particularly describes dies used in *presses* and hence limits the term as used in section 4558, subdivision (a)(4); but, because the first characteristic necessarily implies the second, [it is proper to] treat[] the second characteristic as a test of whether a tool is a die within the meaning of section 4558, subdivision (a)(4)." (*Rosales*, *supra*, 22 Cal.4th at p. 285.) The *Rosales* court then defined "die" as "a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding" as opposed to "a tool that imparts shape by cutting *along* the material in the manner of a blade." (*Ibid.*)

The *Rosales* court further noted: "It may be that one or more types of dies referred to in the quoted dictionary definitions are exceptions to the above general principles in that they act to shape material by means other than by pressing or impacting against or through the material. Assuming that to be so, however, we nonetheless do not believe the Legislature intended the term 'die' in section 4558, subdivision (a)(4)—a die used in a power press—to be understood more broadly than as a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding. Indeed . . . the Legislature presumably believed the operation of power *presses* without point of operation guards to be particularly dangerous, because a press typically forms or cuts the material by use of high pressure or strong impact of the die against or through the material, using a 'powerful pressing or stamping motion which can

7

cause serious crush injuries.' [Citation.] In defining a 'power press,' for purposes of section 4558, in terms of a 'die,' the Legislature patently intended to embody the characteristic that differentiates 'press[es]' from other 'material-forming machine[s],' i.e., the use of a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding." (*Rosales*, *supra*, 22 Cal.4th at pp. 285-286.)

Applying these definitions, the *Rosales* court held that a power lathe used to manufacture aluminum knobs was not a power press within the meaning of section 4558 because the "V-notching tool" used to shape the aluminum into a knob by cutting the material along its surface, and which injured the plaintiff, was not a die. (*Rosales*, *supra*, 22 Cal.4th at p. 285; see *Graham v. Hopkins* (1993) 13 Cal.App.4th 1483, 1487-1489 [wood-molding machine that did not utilize a die was not a power press]; *Ceja*, *supra*, 196 Cal.App.3d at p. 1377 [small handheld circular saw is not a power press under section 4558 because its blade is not a die].)

## D. The Power Press Exception Does Not Apply Here

In moving for summary judgment, PS Baking had the initial burden of showing that Munoz could not establish one or more elements of his Labor Code section 4558 claim or that PS Baking had a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2).) The trial court concluded that PS Baking met its burden. Munoz challenges the court's conclusion, contending that he met his burden of producing evidence demonstrating there was a triable issue of material fact regarding whether the measuring piston and measuring

chamber met the definition of a die, and that the trial court erred in finding as a matter of law that the dough machine was not a power press because "it simply separates a small portion from a larger portion and drops a ball of dough onto the conveyor to be carried to the rounder. There is no upper or lower die that imparts shape to the dough . . . ." We reject Munoz's challenge.

Although the question of whether a particular machine is a power press within the meaning of section 4558 typically is a question of fact for the jury (*Islas v. D & G Manufacturing Co., Inc.* (2004) 120 Cal.App.4th 571, 580), in an appropriate case the court can resolve the question as a matter of law on summary judgment. (See *Rosales*, *supra*, 22 Cal.4th at pp. 285-286 [V-notching tool that cuts material rotating on a lathe is not a die; lathe using a sharp-edge cutting tool is not a power press]; *McCoy v. Zahniser Graphics, Inc.* (1995) 39 Cal.App.4th 107, 111 [sheet metal plate used in printing process is not a die within the meaning of section 4558; printing press is not a power press].) This is such a case. (See *Puentes v. Wells Fargo Home Mortgage, Inc.* (2008) 160 Cal.App.4th 638, 642-643 [where "'the material facts are not in dispute and the parties simply dispute the legal significance of the facts, the matter may be resolved on summary judgment as a matter of law'"].)

Here, the trial court was presented with the evidence, via a series of images, videos, diagrams, and expert declarations, of how the machine cuts the dough. On one hand, PS Baking's expert, Dr. Mack A. Quan, opined that the dough machine is "not a power press based on its operation, components and characteristics." Specifically, he

9

declared: "The feed of the dough into the dough feed chamber is accomplished by gravity alone with no moving parts. The severing of the dough by the dividing knife is accomplished by passing the sharp edge of the knife through the dough. There is no lower die and there is no mirror image of the blade formed in the dough. The severing and separation of the dough is accomplished using the sharp edge of the dividing knife in a manner analogous to a kitchen knife or razor. The infeed piston simply transports the dough into the rotating slide through holes in the partition plate. There is no upper or lower die and no mirror image of the piston or partition plate is imparted to the dough. In a similar manner to the dividing knife, the rotating slide severs the dough in a rotational movement using a sharp edge. There is no lower die and there is no mirror image of the rotating knife formed in the dough. The measuring piston is simply a cavity to hold the dough as the rotating slide rotates downward. There is no moving upper or lower die that imparts shape to the dough and there is no mirror image of the measuring piston formed in the dough. Finally, the ejection of the dough form [*sic*] the measuring piston onto a conveyer belt is not effectuated with an upper and lower die and does not impart its shape to the ejected dough. The conveyer belt transports the dough from the machine without an upper or lower die and without forming its shape into the dough."

In contrast, Munoz offered the expert opinion of Mark R. Cannon, who stated that the dough machine contained a die that imparted shape to material by using the "measuring piston" and "measuring chamber" in conjunction with the piston. Mr. Cannon found the dough machine to meet the definition of power press because "it

10

forms uniform pieces of dough in the production of bread using a die ('measuring chamber' at the end of the 'measuring piston' impacted by the 'piston') . . . ." Mr. Cannon criticized Dr. Quan's opinion that the cavity into which the dough is forced is merely a place that holds the dough. According to Mr. Cannon, the cavity, or "forming cavity" is a "forming die which imparts shape to the dough in order to produce consistent, repeatable and uniform pieces."

The trial court considered the conflicting expert opinions, along with all of the evidence that demonstrated how the dough machine worked, and concluded that PS Baking was entitled to summary judgment. The record before this court supports the trial court's conclusion, and Mr. Cannon's expert declaration fails to raise any triable issue of fact. Mr. Cannon's strained attempt at defining the dough machine and its parts as a power press with "die" parts is unavailing. He relies on the federal Occupational Safety and Health Acts (OSHA) definition of power press, instead of that provided in the statute itself. However, the federal definition is irrelevant because section 4558 makes no reference to OSHA. Furthermore, the *Rosales* court rejected importing "the definition of 'power press' promulgated by the Occupational Safety and Health Standards Board (Cal. Code Regs., tit. 8, § 4188, subd. (b))" into section 4558.[3] (*Rosales*, *supra*, 22 Cal.4th at

---

[3] The dissent notes that Dr. Quan relied on the California Code of Regulations and the Code of Federal Regulations. (Dis. opn., *post*, p. 3, fn. 1.) To the extent that the experts' opinions are based on the definition of power press from sources other than section 4558, their opinions may be called into question, and possibly disregarded. Ultimately, however, given the undisputed facts regarding the functionality of the machine at issue, the question of whether the machine is a power press is a question of law, and the experts' conclusions of law on the issue are not binding or even relevant.

11

p. 286.) "The Occupational Safety and Health Standards Board is not charged with enforcing section 4558's exception to workers' compensation exclusivity. Nor was that board's definition of power press promulgated under the authority of section 4558 or as a purported interpretation of that statute . . . . In any event, section 4558 provides its own definition of 'power press'—a definition that limits the category to machines using dies." (*Rosales*, *supra*, 22 Cal.4th at p. 286; see also *LeFiell Manufacturing Co. v. Superior Court* (2014) 228 Cal.App.4th 883, 894; *Swanson v. Matthews Products, Inc.* (1985) 175 Cal.App.3d 901, 906.)

As noted above, section 4558, subdivision (a)(4), defines a "power press" as "any material-forming machine that utilizes a *die* which is designed for use in the manufacture of other products." (Italics added.) Under this unambiguous statutory language, which we give "'a plain and commonsense meaning'" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165), in order for a material-forming machine to qualify as a power press under the statute, it must contain a die, and the die must be used to manufacture another product. According to the dissent, such a die exists in the dough machine; however, it operates horizontally, with the upper tool being the infeed piston and the lower tool being the measuring chamber. We disagree. To suggest that the infeed piston and the measuring chamber constitute a die stretches the definition of die as set forth by the California Supreme Court. The Supreme Court has ruled that "the term 'die' clearly denotes not *all* material-forming tools, but a subset of such tools." (*Rosales*, *supra*, 22 Cal.4th at p. 285.) More specifically, for purposes of section 4558, "die" is defined as "a

12

tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding," as opposed to "a tool that imparts shape by cutting *along* the material in the manner of a blade." (*Rosales*, *supra*, 22 Cal.4th at p. 285.) Or, in this case, by merely pushing the measured material forward.

Moreover, we are mindful of the fact that "'Section 4558 was enacted as part of an extensive overhaul of the workers['] compensation system designed to address perceived inadequacies in the rules. Employees claimed benefits were too low, while employers and their insurers felt the system was too costly, particularly due to the increasing number of exceptions to the workers' compensation exclusive remedy rule. The resulting legislation reflected a carefully crafted compromise among employer, employee and insurer groups providing increased benefits for injured workers and their families and the potential for decreased expenses for the employer by strengthening the exclusive remedy rules. In the final legislative package there were only four circumstances under which a worker could bring a civil action against the employer, including the power press exception at issue here. [¶] The language of section 4558 reflects the Legislature's careful drafting of the terms triggering the application of the statute.' [Citation.] Accordingly, the power press exception to the workers' compensation exclusivity rule in section 4558 must be narrowly construed." (*LeFiell Manufacturing Company v. Superior Court*, *supra*, 55 Cal.4th at p. 286.)

While we are cognizant of the gravity of harm that may occur from using the dough machine, we cannot rewrite a statute to insert what has been excluded, i.e., to bring

13

in a dough machine within the scope of section 4558 because of the danger it potentially poses. "[T]he Legislature was free to assume that the need for protection was 'most evident' in the case of power presses which utilize dies. The Legislature could properly conclude that those machines *uniformly* present a serious danger to workers when point of operation guards are removed, because they uniformly employ a powerful pressing or stamping motion which can cause serious crush injuries. It is true that other large power machines might also present a similar degree of danger. However, the Legislature was not required to provide a similar exception to those machines . . . ." (*Graham v. Hopkins*, *supra*, 13 Cal.App.4th at p. 1490, italics in original.)

Applying the *Rosales* court's definition of "die,"[4] to the undisputed facts of this case, the dough machine forms the material by cutting along its surface, not by "punching, stamping or extruding" (*Rosales*, *supra*, 22 Cal.4th at p. 285) and then pushing the cut material forward and out of the machine. Moreover, the dough machine does not manufacture another/different product, it merely reduces the size of the dough. What goes into the machine comes out of the machine, albeit in smaller pieces: A large amount of dough goes in, and smaller sections of dough come out. Thus, the trial court correctly concluded the tools (the "measuring chamber," "measuring piston," and "forming cavity") utilized by the dough machine did not, as a matter of law, constitute a die.

---

[4] We are bound to follow our California Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 ["all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].)

14

Having concluded the dough machine is not a power press, the issue of whether PS Baking removed, bypassed or failed to install a point of operation guard (interlock sensor/switch) on the dough machine is moot.

## III. DISPOSITION

The judgment is affirmed. Defendant and Respondent PS Baking shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST      
Acting P. J.

I concur:

CODRINGTON      
                     J.

King, J., Dissenting.

A power press is "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products." (Lab. Code, § 4558, subd. (a)(4).)

Here, the trial court and the majority conclude as a matter of law that the machine in question does not utilize a "die." I disagree. To the extent that the procedural posture of this matter is at summary judgment, I believe a triable issue of fact exists as to whether the dough divider machine uses a die in the manufacturing of a product.

"First, [a] die impart[s] form to the material by impact or pressure *against* the material, rather than *along* the material. Second, [it] impart[s] to the material some version of the die's own shape. The two characteristics are logically related, since the die, acting by impact against the material, can only alter the form of the material where it impacts it, necessarily leaving an impression or cutout of its own shape . . . . [¶] In all its pertinent uses, then, the term 'die' refers to a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding . . . ." (*Rosales v. Deputy Ace Medical Co*. (2000) 22 Cal.4th 279, 285 (*Rosales*).)

Initially, it must be indicated that whether or not the machine utilizes a "die" is normally a question of fact even when the underlying facts are undisputed. As indicated in *Islas v. D & G Manufacturing Co., Inc.* (2004) 120 Cal.App.4th 571 at pages 579 and

1

580:  "[T]he physical configuration of the machine in question is not disputed, but the parties' showings raise conflicting inferences as to whether its blades are properly characterized as a 'die.'  A reasonable fact finder could determine that these blades sufficiently display the two features that the *Rosales* court required of a die.  Because the blades are square and nearly parallel and the machine employs hydraulic pressure, a fact finder could conclude that the blades cut primarily 'by impact or pressure *against* the material,' leaving an impression of the blades in the stock, namely, a straight line. [Citation.]  Alternatively, a reasonable fact finder could determine that the machine does not use a die because it cuts *along* the stock, given that the blades are not precisely parallel.  [¶]  The issue was thus a question for the jury.  That its resolution also determines whether [the plaintiff] falls outside the 'exclusive remedy' rule of the Labor Code does not alter this conclusion, given that factual issues pertinent to application of this rule are generally submitted to the jury."

Here, both defendant, Palm Springs Baking Company, Inc., and plaintiff, Jose DeJesus Munoz, submitted expert declarations.  Both experts generally agree on how the machine works.  From there, however, their opinions are divergent and result in different conclusions.  Defendant's expert, Mack A. Quan, describes the relevant process as follows:  "The dough moves downward from the hopper by gravity into the top of the dough feed chamber.  Once the feed chamber is full, the horizontal dividing knife severs the dough and closes off the opening in the top of the feed chamber from the hopper.  *At the same time a horizontal infeed piston pushes the dough in the feed chamber through*

2

*holes in a partition plate into the rotating slide.* The rotating slide consists of a cylinder, *measuring piston* and [a] dough ejection mechanism." (Italics added.) Mr. Quan concludes that based on provisions of the California Code of Regulations and the Code of Federal Regulations: "The infeed piston simply transports the dough into the rotating slide through holes in the partition plate. There is no upper or lower die and no mirror image of the piston or partition plate is imparted to the dough."[1]

Plaintiff's expert, Mark R. Cannon, describes the process as "a mass of dough is first fed into the machine through the 'hopper.' . . . The knife operates to separate a portion of this dough that is then sucked by vacuum into the 'suction chamber.' . . . The vacuum in the 'suction chamber' is created by the 'piston moving horizontally away from the 'measuring piston' or die. . . . *The 'piston' then reverses course and pushes the dough through horizontal pressure and force toward the 'measuring piston'/die, and the 'piston' then forces the dough into the 'measuring chamber'/die*, the dough that is forced into the 'measuring chamber'/die assumes the size and shape of that chamber which on its two sides consists of the 'piston' and the 'measuring piston.' . . . The action of the two pistons/dies imparts the shape of the 'measuring chamber' on the dough in order to form a uniform and precisely shaped piece of dough." Based on *Rosales*, Mr. Cannon concludes: "[I]t is my opinion that the 'measuring chamber' on the dough divider is a

---

[1] Throughout his declaration Mr. Quan relied on the California Code of Regulations and the Code of Federal Regulations. As set forth in *Rosales*: "[Labor Code] section 4558 provides its own definition of 'power press,'" and is not to be necessarily guided by the California Code of Regulations. (*Rosales v. Deputy Ace Medical Co., supra,* 22 Cal.4th at p. 286.)

3

'die' because it meets [the *Rosales*] definition . . . .  The 'piston' that forces the dough into the 'measuring chamber' is the impacting or other side of the 'die.'" (See *Alvis v. County of Ventura* (2009) 178 Cal.App.4th 536, 539 ["In summary judgment or adjudication motions, conflicting declarations from experts on opposing sides usually establish a triable issue of fact."].)

Even were we to ignore the expert declarations and simply view the workings of the machine from a lay standpoint, it is my view that not only is there a triable issue of fact as to whether a die is utilized, but the evidence preponderates in favor of a conclusion that a die is utilized.

While not necessarily exclusive, a die can consist "of an upper and lower tool that together form a set.  A die usually forms material.  It can cut material.  It cuts things in a substantially different way, however, from a saw blade." (*Ceja v. J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1376, fn. omitted.)[2]  While a die may normally be thought of as operating in a vertical fashion with an upper and lower tool, the present die operates horizontally (see exhibits G1, G2, & G3) with the upper tool being the infeed piston and the lower tool being the measuring chamber.  The blade and the infeed piston are attached to separate arms and operate in a synchronized manner with the blade moving through and cutting the dough before the dough is impacted by the infeed piston.  At a standard

---

[2]  To the extent *Ceja* suggests that a die must consist of an upper tool and lower tool, *Graham v. Hopkins* (1993) 13 Cal.App.4th 1483, 1487 and 1488 is critical.

setting the infeed piston makes one complete stroke every five seconds and at its highest adjustment, one complete stroke every 3.5 seconds.[3]

As required by *Rosales*, the present die "imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding . . . ." (*Rosales, supra,* 22 Cal.4th at p. 285.) The upper tool (infeed piston) impacts and pushes the dough into the opening of the lower tool (measuring chamber). The dough enters through an opening to the measuring chamber, which is of a diameter similar to that of the face of the infeed piston, thus taking on the form of the measuring chamber on one side and the infeed piston on the other. As necessitated by *Rosales*, there is force or pressure applied *against* the dough with the dough taking on the shape of the lower tool of the die (measuring chamber).

As provided by Labor Code, section 4558, subdivision (a)(4) a power press is "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products." Here, there exists a triable issue of fact as to whether the infeed piston and measuring chamber is a die which is utilized in the manufacturing of defendant's product.

KING             

J.

---

[3] The incident resulted in plaintiff's hand being totally severed. Gehovany Ramirez testified that immediately following the incident plaintiff's hand was still in the machine and plaintiff was laying on the floor.