[No. B048170. Second Dist., Div. Six. June 11, 1991.]

WILLIAM J. BINGHAM, Plaintiff and Respondent, v.
CTS CORPORATION, Defendant and Appellant.

58

## COUNSEL

Jones, Day, Reavis & Pogue, Deborah Crandall Saxe and Stephen R. Waldron for Defendant and Appellant.

James M. Duenow, Woelfle & Stevens, F. Rodman Woefle and Kathlene Bonnigson for Plaintiff and Respondent.

OPINION

**GILBERT, J.—** Here we hold that the term "point of operation guard" as used in Labor Code[1] section 4558 includes any apparatus or device that keeps a worker's hands outside the point of operation while operating a power press.

CTS Corporation (CTS) appeals from the judgment entered after a jury rendered a special verdict in favor of respondent, William J. Bingham (Bingham), in a civil suit for damages for injuries arising out of an industrial accident. We affirm.

FACTS

Bingham suffered severe, permanent injury to his wrist when it was crushed by the ram of the 175-ton power press brake he was operating on the job at CTS.

A power press brake is an industrial machine used to bend and form pieces of metal. A press brake reforms metal by use of a 12-foot ram which the press brake operator fits with various dies called punches. The ram moves the fitted punch through a 10-inch space to a "V" shaped die in the bed of the machine. The punch changes the shape of metal pieces placed in between the dies. The 10-inch space through which the top die moves to the bed of the press to reform the metal is called the "point of operation." The point of operation is as wide as the top die used for the particular job.

This power press had two safety devices called "palm buttons" and a "light curtain." Palm buttons are two horizontally placed buttons located on a movable pedestal adjacent to the machine operator. The operator must push both buttons simultaneously to activate the machine. The buttons are situated far enough apart so that the operator must use both hands to engage them. Pushing the palm buttons causes the punch to descend through the point of operation to bend the metal. Use of these buttons ensures that the operator's hands cannot be placed in the point of operation while the ram descends.

The light curtain consists of 15 light beams which shine horizontally at 1-inch intervals through the point of operation. Each beam has an individual receiver which has a toggle switch to turn off that receiver. All the light beams remain on even if one or more of the receivers is deactivated. The press brake can function with up to seven of its receivers turned off.

---

[1]All further statutory references are to the Labor Code unless otherwise specified.

The manufacturer equipped the machine with the palm buttons, but not with the light curtain. CTS ordered the manufacturer to wire the machine for installation of a light curtain. Another company designed the light curtain, and CTS installed it.

When the accident occurred, Bingham was using the press brake to make small metal boxes which are approximately eleven inches long, five inches wide and nearly five inches high. The boxes were formed from flat pieces of metal by a series of operations of the press brake.

Bingham began to make each box by pushing a flat piece of metal against a series of four levers, or fingers, of different lengths which are located behind the press brake's point of operation. These fingers function as backstops to change the distance that the metal could be pushed into the machine by the operator. Changing the configuration of the fingers determines the place where the metal would be bent.

First, Bingham placed the sheet of metal against the fingers and operated the press to bend the two shorter ends. Bingham then reached around the top die to flip two of the fingers to make four bends on the long side of the metal sheet. Finally, he was required to flip two fingers back down in preparation for making the first two bends on another box.

Bingham's supervisor, Jim De Rosa, determined how Bingham was to use the press brake for particular projects. One of De Rosa's functions was to "set-up" the machine for each project. For this project, De Rosa decided that Bingham would need to hold the metal with his hands against the fingers to maintain close tolerances. Because De Rosa determined that Bingham would need to use his hands constantly to make the boxes, he moved the palm buttons to the side of the machine so that they could not be used. De Rosa required Bingham to use a foot treadle instead of the palm buttons to operate the machine. Use of the foot treadle left Bingham's hands free to hold the metal against the fingers of the machine.

De Rosa also turned off seven of the fifteen receivers on the light curtain. Doing so allowed the operator to place the box or one's hands in the point of operation without rendering the machine inoperable. De Rosa also required Bingham to manually change the fingers, even though the fingers could be changed automatically.

The accident occurred when Bingham was preparing to flip the fingers by reaching through the point of operation with his hand. While doing so he inadvertently pressed the foot treadle. The ram came down and crushed his wrist between the punch and the bottom die.

After the accident, Bingham filed a claim against CTS for workers' compensation, and ultimately received payment of about $190,000.

Bingham also filed this civil complaint against CTS, among others. Bingham settled with all the other defendants for a total of $90,000. Bingham proceeded against CTS for violation of section 4558, which provides an exception to the rule that the remedy of workers' compensation is exclusive. (§ 3601.)

Section 4558[2] allows an employee to bring a legal action against an employer for injuries caused, among other things, by the employer's knowing removal of a point of operation guard in a power press. The section also provides that the employer will not be liable absent proof that the manufacturer either installed guards or provided by specifications for the attachment of the guards and conveyed this information to the employer.

Upon a special verdict, the jury ruled that CTS had violated section 4558 and that CTS was liable to Bingham in the sum of $1,181,700. Subtracting credits due CTS for the workers' compensation award and for the settlement amounts paid Bingham by the other defendants, the trial court awarded Bingham $901,660.96, as well as interest and costs. CTS's motions for new trial and for judgment notwithstanding the verdict were denied. This appeal followed.

---

[2]Section 4558 states, in pertinent part: "(a) As used in this section:

"(1) 'Employer' means a named identifiable person who is, prior to the time of the employee's injury or death, an owner or supervisor having managerial authority to direct and control the acts of employees.

"(2) 'Failure to install' means . . .

"(3) 'Manufacturer' means . . .

"(4) 'Power press' means . . .

"(5) 'Removal' means physical removal of a point of operation guard which is either installed by the manufacturer or installed by the employer pursuant to the requirements or instructions of the manufacturer.

"(6) 'Specifically authorized' means an affirmative instruction issued by the employer prior to the time of the employee's physical injury or death, but shall not mean any subsequent acquiescence in, or ratification of, removal of a point of operation safety guard.

"(b) An employee . . . may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death.

"(c) No liability shall arise under this section absent proof that the manufacturer designed, installed, required, or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer. Proof of conveyance of this information to the employer by the manufacturer may come from any source.

"(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

### DISCUSSION

CTS contends that the phrase "point of operation guard" is a legal term of art as used in section 4558 and as defined in title 8 of the California Code of Regulations (hereafter Regulations). CTS asserts that the trial court erred in giving the jury a dictionary definition of the word "guard." The trial court instructed the jury that "[t]he word 'guard' as used in California Labor Code section 4558 means, 'any device or apparatus that prevents injury, damage or loss; an attachment or covering put on a machine to protect the operator.' "

CTS also contends that because palm buttons and light curtains are defined by the Regulations as "point of operation devices" rather than guards, it cannot be held liable under section 4558 because that section uses the word guards, but not devices.

CTS also contends it cannot be held liable under section 4558 because the manufacturer of the power press did not require the use of any "point of operation guards" on this power press, as that phrase is defined in the Regulations.

CTS also contends that it is entitled to a judgment notwithstanding the verdict because it neither failed to install nor removed the palm buttons or the light curtain within the meaning of section 4558.

The construction of the meaning of a statute is a matter of law which we consider anew. (*Generes* v. *Justice Court* (1980) 106 Cal.App.3d 678, 681 [165 Cal.Rptr. 222]; *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *California Ins. Guarantee Assn.* v. *Liemsakul* (1987) 193 Cal.App.3d 433, 438 [238 Cal.Rptr. 346].) Nonetheless, we give deferential consideration to the trial court's opinion and ruling on the meaning of section 4558. (*Generes, supra*, at p. 681.)

### *The Regulations on Point of Operation Guards and Devices*

Section 4206, subdivision (a) of the Regulations requires safeguarding the point of operation of power presses. It states: "(a) General. The employer shall provide and ensure the use of properly applied and adjusted point of operation devices or guards for every operation performed on a power operated press."

Section 4214 of the Regulations states ways in which to guard a press brake.[3]

Regulations sections 4207 and 4208 discuss point of operation guards and devices, respectively. Regulations section 4207 explains the requirements for point of operation guards, in pertinent part, as follows: "(a) Every point of operation guard shall meet the following design, construction, application, and adjustment requirements:

"(1) It shall prevent entry of hands or fingers into the point of operation by reaching through, over, under or around the guard;

". . . . . . . . . . . . . . . . . . . . . . . . . .

"(4) A hand tool such as a box, open end or adjustable wrench, socket or key wrench shall be required to remove the guard. . . ."

---

[3]Section 4214 of the Regulations requires that "[p]ress brakes . . . shall be guarded in a manner that will accomplish the following:

"(1) Restrain the operator(s) from inadvertently reaching into the point of operation, or

"(2) Inhibit machine operation if the operator's hand or hands are inadvertently within or placed within the point of operation, or

"(3) Automatically withdraw the operator's hands if they are inadvertently within the point of operation.

"(b) Devices that will accomplish (a)(1), (2) and (3) above include but are not restricted to those listed below:

"(1) Presence-sensing device.

"(2) Holdout or Restraint Device.

"(3) Pullout Device.

"(4) Two-Hand Control Device (see 4193(e)).

"(5) Type A or B Gate or Movable Barrier Device.

"(6) Fixed Barrier Guard (see 4207).

"(7) An arrangement of stops and holding devices such as a feed table or other material support, which will assist in positioning and supporting the material being worked so that the controls can be remotely located. When such stops and material supports are used, the controls shall be so located that the operator(s) can not activate the control(s) and reach into the point of operation.

"(8) Any other system of guards, automatic or semi-automatic feeds, etc., that will allow the material to be worked and effectively prevent the operator's hand(s) from entering or being in the point of operation during the die-closing portion of the press stroke.

"(9) When the nature of the work or size and/or shape of material being worked is such that compliance with the provisions of Section 4214(b)(1) through (8) is not practical, the employer shall ensure compliance with the following:

"(A) The operator shall be qualified, and

"(B) The operator maintains a safe distance from the point of operation through the use of hand tools or the size and/or shape of the material being worked so that the operator's hands never enter the point of operation, and

"(C) Only general-purpose press brakes with general-purpose dies are used. . . ."

Regulations section 4208[4] explains the requirements for point of operation devices. They, like point of operation guards, are designed to protect the operator from injury.

█ In determining the meaning of the words of a statute, we must read the legislation in the light of the objective sought to be achieved by it. (See *Ceja* v. *J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1375 [242 Cal.Rptr. 531]; *People* v. *Carroll* (1970) 1 Cal.3d 581 [83 Cal.Rptr. 176, 463 P.2d 400].) █ We agree with the *Ceja* court that the obvious legislative

---

[4]Regulations section 4208 provides, in pertinent part, as follows:

"(a) Point of operation devices shall protect the operator by:

"(1) Preventing and/or stopping normal stroking of the press if the operator's hands are inadvertently placed in the point of operation; or

"(2) Preventing the operator from inadvertently reaching into the point of operation; or

"(3) Withdrawing the operator's hands if they are inadvertently located in the point of operation, as the dies close; or

"(4) Preventing the operator from inadvertently reaching into the point of operation at all times; or

"(5) Requiring application of both of the operator's hands to machine operating controls and locating such controls at such a safety distance from the point of operation that the slide completes the downward travel or stops before the operator can reach into the point of operation with his hands; or

"(6) Enclosing the point of operation before a press stroke can be initiated, and maintaining this closed condition until the motion of the slide has ceased; or

"(7) Enclosing the point of operation before a press stroke can be initiated, so as to prevent an operator from reaching into the point of operation prior to die closure or prior to cessation of slide motion during the downward stroke.

". . . . . . . . . . . . . . . . . . . . . . . . .

"(c) A presence sensing point of operation device shall protect the operator as provided in subsection (a)(1) of this section, and shall be interlocked into the control circuit to prevent or stop slide motion if any part of the operator's hand or other part of his/her body is within the sensing field of the device during the downstroke of the press slide.

". . . . . . . . . . . . . . . . . . . . . . . . .

"(3) The device shall be constructed so that a failure within the system does not prevent the normal stopping action from being applied to the press when required, but does prevent the initiation of a successive stroke until the failure is corrected. The failure shall be indicated by the system.

"Note: Muting (bypassing of the protective function) of such device, during the upstroke of the press slide is permitted for the purpose of parts ejection, circuit checking, feeding and when material in contact with the dies being formed on a press brake passes through the sensing field.

"(4) The safety distance (D:SIS:KS) from the sensing field to the point of operation shall be greater than the distance determined by the following formula:

". . . . . . . . . . . . . . . . . . . . . . . .

"(5) Guards shall be used to protect all areas of entry to the point of operation not protected by the presence sensing device.

". . . . . . . . . . . . . . . . . . . . . . . . .

"(h) . . . [¶] (4) . . . [¶] (i) Hand feeding tools are intended for placing and removing materials in and from the press. Hand feeding tools are not a point of operation guard or protection device and shall not be used in lieu of the 'guards' or devices required in this section."

intent and purpose of section 4558 is "to protect workers from employers who wilfully remove or fail to install appropriate guards on large power tools. . . . These sorts of machines are difficult to stop while they are in their sequence of operation. Without guards, workers are susceptible to extremely serious injuries." (*Ceja, supra,* at p. 1377.)

We read the applicable sections of the Regulations as a whole to assist us in ascertaining the meaning of the term "guard," which is not defined by section 4558. (See *Ceja v. J. R. Wood, Inc., supra,* 196 Cal.App.3d at p. 1376.) ▆▆▆ We avoid literal, narrow or hypertechnical meanings of words so as to give effect to the manifest objectives of the legislation which appear from the provisions considered as a whole, in light of legislative history. (*California Ins. Guarantee Assn. v. Liemsakul, supra,* 193 Cal.App.3d at p. 439.)

▆▆▆ The Regulations expressly require safety apparatus which effectively ensures that workers' hands and arms cannot be mangled by power presses. In particular, section 4214 of the Regulations expressly requires that press brakes be guarded in a manner which will accomplish the goal of restraining workers from inadvertently reaching into the point of operation. Sections 4206 and 4214 of the Regulations, when read in conjunction with sections 4207 and 4208 of the Regulations, show that the term "guard" in section 4558 is used generically to include almost any apparatus a manufacturer indicates will accomplish this purpose. Thus, a device as defined in the Regulations, as well as a point of operation guard, serve to protect a worker's hands.

We find that the term guard, as used in section 4558, is meant to include the myriad apparatus which are available to accomplish the purpose of keeping the hands of workers outside the point of operation whenever the ram is capable of descending. Because we find that the term guard is not a specific legal term of art, we hold that the trial court properly provided the jury with a dictionary definition of the term guard to explain its meaning under section 4558. (*Ceja v. J. R. Wood, Inc., supra,* 196 Cal.App.3d at pp. 1375-1376.)

In particular, we find that the trial court did not err in construing section 4558 to include palm buttons and light curtains as falling within the meaning of the term guard as used in section 4558.

### Guarding Requirements of the Manufacturer

▆▆▆ CTS argues that even if the term guard includes palm buttons and light curtains, the trial court erred in denying its motion for judgment notwithstanding the verdict because there is no evidence "that the manufacturer designed, installed, required, or otherwise provided by specification for

the attachment" of a light curtain and conveyed that information to CTS. (§ 4558, subd. (c).)

CTS also maintains there is no evidence that it removed either the palm buttons or the light curtain within the meaning of section 4558, subdivision (a)(5).

■ The trial court's power to grant a motion for judgment notwithstanding the verdict is quite limited. It may do so only when there is no substantial conflict in the evidence. The court cannot reweigh the evidence. The court must indulge in every inference in favor of the party opposing the motion. A motion for judgment notwithstanding the verdict must be denied unless there is no other reasonable conclusion deducible from the evidence except that the moving party must prevail. (*Valdez* v. *J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 513 [124 Cal.Rptr. 467].)

■ The phrase "designed, installed, required, or otherwise provided by specification for the attachment of the guards" contained in section 4558, subdivision (c) is written in the disjunctive. If any inference can be derived from the evidence that any of these terms can describe the information conveyed to CTS by the manufacturer, CTS is not relieved from liability under section 4558, subdivision (c).

Here, the light curtain was designed by another company, and it was installed by CTS. The question remains whether there is any evidence, or inference therefrom, to show that the manufacturer in any way required or otherwise provided by specification for the attachment of a light curtain to the power press and conveyed that information to CTS.

The manufacturer provided CTS with an operation and maintenance manual, a safety manual and a manual on press brake safeguarding. The manufacturer's safety manual checklist requires that these safety manuals and operator manuals be attached to the machine.

The manufacturer's operation and maintenance manual acknowledges that "[t]he purpose of a press brake is to bend metal and it is obvious that this same capacity will sever arms, hands, fingers or any other part of the body that is in the point of operation when the ram is activated. [¶] During operation, all parts of your body must be completely clear of the work area. NEVER PLACE ANY PART OF YOUR BODY IN THE POINT OF OPERATION (Die area)." (The words "point of operation" are written in bold print.) A very similar warning appears in the safety manual.

The press brake safeguarding manual also states that "[p]roper operating instructions and safeguarding are required to complete the system." It pro-

vides a point of operation selection chart specifying particular safeguarding devices to be used while certain types of work are performed in the press brake. For work involving "[b]ends on 3rd & 4th side such as a box," as performed here, the chart specifies that a photo electric presence sensing device must be used, among other safety devices listed. Such presence sensing devices are also required for "[w]ork placed completely in the die area by Operator(s)."

Viewed in a light most favorable to Bingham and indulging in every inference in support of the special verdict, we find that these statements in the manufacturer's literature constitute a specification or requirement that a light curtain be used.

The selection chart also requires that dual palm buttons be used whenever work is placed completely in the die area by an operator of a hydraulic press brake with a foot switch. The press brake used by Bingham appears to have been a hydraulic one with a foot treadle. The chart did not state whether dual palm buttons are required for a press brake so equipped.

In its explanation of how to safely construct a small box, however, the manufacturer's safeguarding manual explained that whenever such boxes have sides higher than one and one-half inches, another safeguarding method may be necessary in addition to a light curtain "as the formed sides of the box will interrupt the light beam."

Again, we are constrained to view the evidence in the light most supportive of the verdict and to indulge in every inference possible. So viewed, we find that the manufacturer also required the use of dual palm buttons for this operation of its press brake.

Also, the manufacturer's operation and maintenance manual lists dual palm buttons as "standard controls" on its press brake, and explains how they function. The manufacturer, therefore, not only designed and installed dual palm buttons as standard equipment on this press brake, it also required their use for this particular operation. The trial court properly denied the motion for judgment notwithstanding the verdict.

*Requirement of Removal*

CTS also claims its motion for judgment notwithstanding the verdict was improperly denied because De Rosa did not physically remove either the palm buttons or the light curtain within the meaning of section 4558, subdivision (a)(5). Section 4558, subdivision (a)(5) defines " 'Removal' " as physical removal of a point of operation guard.

Under section 4207, subdivision (a)(4) of the Regulations, physical removal is defined to mean that "[a] hand tool such as a box, open end or adjustable wrench, socket or key wrench shall be required to remove the guard." CTS argues it cannot be held liable under section 4558 because no hand tools were used to remove the palm buttons or the light curtain.

Because section 4558, and the Regulations as a whole, concern all means of safeguarding the point of operation, many of which are rendered inoperable without the use of hand tools, we find that this definition of "physical removal" applies only to section 4207 of the Regulations.

Physical removal, for the purpose of liability under section 4558, means to render a safeguarding apparatus, whether a device or point of operation guard, dysfunctional or unavailable for use by the operator for the particular task assigned. When the Regulations are read as a whole, we believe this is the most reasonable inference which can be derived from them in conjunction with section 4558.

In the instant case, De Rosa deliberately moved the palm buttons away from Bingham so that he could not use them and he ordered Bingham to use his hands to hold the metal and to flip the fingers on the press manually.

Similarly, he deliberately switched off seven of the fifteen receivers on the light curtain. By doing so, De Rosa knowingly and willfully rendered the palm buttons and the light curtain dysfunctional for safeguarding Bingham's hands and arms while he made the metal boxes. This enabled him to make boxes more quickly but not more safely.

The manufacturer conveyed the requirement for use of these safeguarding measures to CTS through its literature. The purpose of section 4558, and the Regulations thereunder, was thereby defeated by CTS.

The judgment is affirmed.

Stone (S. J.), P. J., and Yegan, J., concurred.