Filed 8/6/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LEFIELL MANUFACTURING COMPANY,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF<br>LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>O'NEIL WATROUS,<br><br>    Real Party in Interest. | B254261<br><br>(Los Angeles County<br>Super. Ct. No. VC055585) |

ORIGINAL PROCEEDINGS in mandate.  Rafael A. Ongkeko, Judge.  Petition granted.

Malek & Malek, Sandra L. Malek and Jeffrey L. Malek for Petitioner.

No appearance for Respondent.

Purcell Law and Chris Purcell for Real Party in Interest.

———————————

Labor Code section 4558[1] provides an exception to the exclusivity of the workers' compensation system for employees injured as a result of the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press. The issue presented here is the correct definition and application of the term, "point of operation guard." The meaning of this term is not defined in the statute, and this term has never specifically been defined in case law. A point of operation guard, however, always has been assumed to be an apparatus or device that protects a worker's hands and body parts from the area on the power press where the die imparts shape to material by impact or pressure.

LeFiell Manufacturing Company (LeFiell) filed a petition for writ of mandate challenging an order denying its summary judgment motion on the section 4558 claim asserted in this action. The trial court concluded there was a triable issue of fact as to whether a door that was removed from the Fenn 5F swaging machine operated by plaintiff O'Neil Watrous was a point of operation guard. The door was several inches from the dies in the bed of the swaging machine where the material was formed. Watrous was standing six feet away from the dies while operating the swaging machine and claims to have suffered injuries as a result of the employer's removal of the door. We issued an order to show cause why the relief requested in the petition should or should not be granted.

We conclude the door that was removed from the Fenn 5F swaging machine is not a point of operation guard as a matter of law. The power press exception applies only to

---

[1] Labor Code section 4558, subdivision (b) provides: "An employee, or his or her dependents in the event of the employee's death, may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death." Subdivision (a)(4) defines a power press as "any material–forming machine that utilizes a die which is designed for use in the manufacture of other products."

Unless indicated, all further statutory references are to the Labor Code.

those machines using a die to form material by impact or pressure against the material that impart to the material some version of the die's own shape. (*Rosales v. Depuy Ace Medical Co.* (2000) 22 Cal.4th 279, 284-285 (*Rosales*).) The point of operation on a power press is where the die shapes the material. Thus, a point of operation guard is any device or apparatus that keeps a worker's hands or other body parts outside of the area where the die shapes material by impact or pressure while the worker is operating the power press. In this case, the dies and hammers used in the swaging process were in the bed of the Fenn 5F swaging machine, several inches away from the door that had been removed and several feet away from where Watrous was operating the machine. While the door acted as a barrier from the power press mechanisms, it was not a point of operation guard within the meaning of section 4558. Accordingly, we grant the petition.

FACTS

Watrous suffered serious injuries while operating a Fenn 5F swaging machine in the course and scope of his employment with LeFiell. Watrous filed a complaint alleging a violation of section 4558.[2]

1. *Fenn 5F Swaging Machine is a Power Press*

A swaging machine is used to reduce a larger diameter tube to a smaller diameter. The swaging operation uses a process whereby hammers are actuated within the machine and used against dies that change the shape at the end of the tube. The swaging process compresses the metal so that the end of the tube is smaller in diameter, thicker, and stronger than the rest of the tube.

The Fenn 5F swaging machine has a rotary swaging head that uses an electric motor-driven flywheel connected to a spindle that holds two opposing dies and two associated hammers. The spindle rotates at approximately 194 revolutions per minute (rpm) which generates a centrifugal force that throws the dies and hammers outward (open) against 12 rollers contained within a heavy steel cage surrounding the spindle.

---

[2]    The section 4558 cause of action is Watrous's only remaining claim. (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 281-283, 289-290 (*LeFiell I*).)

3

When the dies are in the open position, the tube is manually fed into the space where the material is formed.

The Fenn 5F swaging machine has a manually operated rack and pinion system that the operator uses to force the tube into the dies each time the dies open. The infeed system contains a feed carriage that uses a circular clamp to hold one end of the tube while leaving the opposite end free to be manually placed in the space where the dies shape the tube. The tube is inserted into this space through a round opening in the door. The operator feeds the tube into the rotary swaging dies by manually turning the feed carriage handwheel, which causes the feed carriage to move toward the dies. After the tube is fully formed, the operator manually withdraws the tube from the machine. At no point during the swaging process would the operator be near the dies and hammers in the bed of the Fenn 5F swaging machine.

2. *Removal of the Door on the Fenn 5F Swaging Machine*

The door had been removed from the Fenn 5F swaging machine that Watrous was operating at the time of the accident. The purpose of the door is for access, and when necessary, to change the dies. The door also functions to hold the dies in place while the power press is in operation. As noted, there is an opening in the center of the door to feed the material to be swaged into the bed of the Fenn 5F swaging machine.

Instead of the door, a metal pressure plate was held in place by clamps. This pressure plate assembly rotated at 194 rpm when the power press was in operation. Like the door, the pressure plate had an opening in the middle to insert the tube and move it toward the dies where the swaging operation took place. The bolts that fastened the pressure plate in place, and additional bolts on the Fenn 5F swaging machine, were exposed when the door was removed.

3. *The Accident*

Watrous was standing approximately six feet from the Fenn 5F swaging machine at the time of the accident and was removing a tube from the machine following the swaging process. He was injured when a piece of metal hit him in the eye. Although Watrous does not remember the accident, his theory is that the tube he was removing

4

from the swaging machine struck the pressure plate assembly, causing the part to be "violently dislodged and launched into [his] eye and occipital lobe."

    4. *LeFiell's Motion for Summary Judgment*

LeFiell brought its summary judgment motion on the ground that Watrous could not establish any of the necessary elements of a section 4558 claim. (See *Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1516.) The underlying premise of LeFiell's motion was, accepting Watrous's theory of the accident, the door was not a point of operation guard as a matter of law. Thus, his injury did not fall within the section 4558 exception.

Our focus is solely on whether, as a matter of law, the door on the Fenn 5F swaging machine is a point of operation guard within the meaning of section 4558. If it is, the determination of whether the manufacturer communicated to LeFiell that the door could not be removed is a question of fact, and the respective parties' interpretation of the product and service manuals on this issue is disputed. If the door is not a point of operation guard on a power press, section 4558 does not apply as a matter of law.

LeFiell's expert opined that the door on the Fenn 5F swaging machine is not a point of operation guard. According to LeFiell's expert, the door was never intended to be a point of operation guard. The opening in the center of the door provides access to the space where the material is formed, and does not "prevent entry of hands or fingers directly" into the space where the dies impart shape to the material. Rather, the point of operation on the Fenn 5F swaging machine is in the bed of the machine where the dies form the shape at the end of the tube through the action of counterpoising hammers. No point of operation guard is required because the dies separate less than one thirty-second of an inch during each stroke of the dies, and the separation is not large enough to allow an operator access to the space where the material is being formed.

In opposition, Watrous's expert agreed that the point of operation on the Fenn 5F swaging machine includes "the area or location at which the two dies strike the workpiece." The expert further agreed that a point of operation guard on a power press must keep a worker's hands out of the area where the material is being formed.

According to the expert, the door on the Fenn 5F swaging machine satisfied these requirements.

"The heavy cast iron door originally supplied by the machine manufacturer with the machine is 'an apparatus that accomplishes the purpose of keeping the hands of the workers outside the point of operation.' In the instant case, the door also serves to prevent the workpieces – especially when the operator must physically hold the workpiece in his hands while removing it from the machine – from engaging the bolt heads and clamps of the assembly that is rotating at 194 rpm. When the door is in the closed position, the dangers posed by the protruding bolt heads and clamps on the rotating assembly are completely eliminated, and the danger posed by the rotating dies is minimal as the dies are several inches inboard from the door's front face."

Watrous's expert referred to the door as a "barrier point of operation guard" to protect workers from the power press mechanisms. Despite the opening in the door, the expert stated the door is a point of operation guard because federal and state occupational safety and health standards, as well as the American National Standards Institute (ANSI), permit openings in point of operation guards by setting forth the maximum permissible openings to prevent entry of hands or fingers into the point of operation.

5. *The Trial Court's Order, LeFiell's Petition*

The trial court denied the motion for summary judgment.[3] The order states: "The motion is denied because both parties dispute whether the 'door' on the machine at issue is actually a point of operation guard for purposes of Labor Code, § 4558."

After the trial court denied the motion for summary judgment, LeFiell filed a petition for writ of mandamus seeking an order directing the trial court to grant the motion for summary judgment. We issued an order to show cause why the relief in the

---

[3] We granted Watrous's unopposed motion to augment the record to include the trial court's order. We deferred ruling on Watrous's request to take judicial notice of the trial court's order (Exhibit 1) and selected legislative history that pertains to section 4558. Having already granted the motion to augment the record, we grant Watrous's request for judicial notice only as to the selected legislative history (Exhibit 2).

6

petition should or should not be granted and ordered a temporary stay of all trial court proceedings while the writ petition was pending.

DISCUSSION

In moving for summary judgment, LeFiell contended that as a matter of law section 4558 did not apply because Watrous's injury was not caused by the knowing removal of, or knowing failure to install, a point of operation guard on a power press. LeFiell defines a "point of operation guard" as a device that keeps workers' hands outside of the area where the die shapes material to avoid crushing injuries to the worker. Watrous's definition is broader and also includes any barrier device or safety guard that protects workers from the power press mechanism, which necessarily includes preventing other types of injuries occurring outside the die space. Based upon the plain language of section 4558, we adopt a narrow construction of the term "point of operation guard" on a power press.

1. *Propriety of Writ Relief and Standard of Review*

An order denying a motion for summary judgment may be reviewed by way of a petition for writ of mandamus. (Code Civ. Proc., § 437c, subd. (m)(1); *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1010-1011.) " 'Where the facts are undisputed and the law establishes the right of a party to an order or to the relief which the court has refused, the writ will lie.' " (*Whitney's at the Beach v. Superior Court* (1970) 3 Cal.App.3d 258, 265.) A writ of mandamus will issue when the denial of a motion for summary judgment results in a trial on a nonactionable claim. (*Prudential Ins. Co. of America, Inc. v. Superior Court* (2002) 98 Cal.App.4th 585, 594.) We independently review summary judgment motions. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)

In construing a statute, our task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) "We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If,

7

however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Ibid*.)

        2. *The Power Press Exception to the Workers' Compensation Exclusivity Rule*

"Where an employee is injured in the course and scope of his or her employment, workers' compensation is generally the exclusive remedy of the employee and his or her dependents against the employer. (Lab. Code, §§ 3600, subd. (a), 3602.) The 'exclusivity rule' is based upon a presumed compensation bargain: '[T]he employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' [Citation.]" (*LeFiell I*, *supra*, 55 Cal.4th at p. 279, fn. omitted.)

There are limited statutory exceptions to the exclusivity rule "that authorize the injured worker to seek to augment the workers' compensation benefits by bringing an action at law for damages against the employer." (*LeFiell I*, *supra*, 55 Cal.4th at pp. 279-280.) One of these statutory exceptions is section 4558. (*LeFiell I*, at p. 280.)

"An employee . . . may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, *a point of operation guard on a power press*, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death." (§ 4558, subd. (b), italics added.) This exception is narrowly construed. (*LeFiell I*, *supra*, 55 Cal.4th at p. 286.)

8

"The obvious legislative intent and purpose in section 4558 is to protect workers from employers who willfully remove or fail to install appropriate guards on large power tools. Many of these power tools are run by large mechanical motors or hydraulically. . . . These sorts of machines are difficult to stop while they are in their sequence of operation. Without guards, workers are susceptible to extremely serious injuries. For this reason, the Legislature passed section 4558, subdivision (b), which subjects employers to legal liability for removing guards from powerful machinery where the manufacturer has designed the machine to have a protective guard while in operation." (*Ceja v. J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1377.)

" 'Section 4558 was enacted as part of an extensive overhaul of the workers' compensation system designed to address perceived inadequacies in the rules. Employees claimed benefits were too low, while employers and their insurers felt the system was too costly, particularly due to the increasing number of exceptions to the workers' compensation exclusive remedy rule. The resulting legislation reflected a carefully crafted compromise among employer, employee and insurer groups providing increased benefits for injured workers and their families and the potential for decreased expenses for the employer by strengthening the exclusive remedy rules. In the final legislative package there were only four circumstances under which a worker could bring a civil action against the employer, including the power press exception at issue here. [¶] The language of section 4558 reflects the Legislature's careful drafting of the terms triggering the application of the statute.' (*Jones v. Keppeler* (1991) 228 Cal.App.3d 705, 709 . . . , fns. omitted.)" (*LeFiell I, supra*, 55 Cal.4th at p. 286.)

The meaning of the term "point of operation guard" in section 4558 is a legal question. (See *Rosales*, *supra*, 22 Cal.4th at p. 282; *Mora v. Hollywood Bed & Spring* (2008) 164 Cal.App.4th 1061, 1068-1069; see also *Gonzalez v. Seal Methods, Inc.* (2014) 223 Cal.App.4th 405, 409-410.)[4] As shall be discussed, the starting point for our

---

[4]     Citing *Islas v. D & G Manufacturing Co., Inc.* (2004) 120 Cal.App.4th 571, 580, Watrous contends that whether an injury-causing machine is a power press is ordinarily a factual issue to be resolved by the jury, and as such, whether the door on the Fenn 5F

interpretation of the plain language of section 4558 is *Rosales*, in which the Supreme Court limited the type of material-forming machines that fell within the section 4558 exception.

### 3. *Definition of "Power Press"*

In *Rosales*, *supra*, 22 Cal.4th 279, the Supreme Court construed the meaning of "die" as used in the definition of a power press in section 4558, subdivision (a)(4) to determine whether the exception applied. (*Rosales*, at pp. 282-288.) A power press is "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products." (§ 4558, subd. (a)(4).) "This definition entails four elements. The power press itself is a machine. It is a machine that forms materials. The formation of materials is effectuated with a die. Finally, the materials being formed with the die are being formed in the manufacture of other products." (*Ceja v. J. R. Wood, Inc.*, *supra*, 196 Cal.App.3d at p. 1376.)

Citing dictionary definitions and case law, the *Rosales* court determined that the term "die," as used in section 4558 does not include all material-forming tools, but a subset of machines with two features. "First, they impart form to the material by impact or pressure *against* the material, rather than *along* the material. Second, they impart to the material some version of the die's own shape. The two characteristics are logically related, since the die, acting by impact against the material, can only alter the form of the material where it impacts it, necessarily leaving an impression or cutout of its own shape (unlike a linear cutting blade that, moving along the surface of the material, can be directed to cut out any desired shape)." (*Rosales*, *supra*, 22 Cal.4th at pp. 284-285.)

"[S]ection 4558's exemption from workers' compensation exclusivity applies, by the statute's own plain and express terms, only to material-forming machines utilizing a die; contrary to the appellate decision below, machines using other types of tools to cut material are not within the statute's application, even if they would meet a regulatory

---

swaging machine is a point of operation guard is also a factual question. Here, unlike *Islas*, the issue presented requires us to construe section 4558.

agency's definition of power press." (*Rosales*, *supra*, 22 Cal.4th at p. 288.) The intent of the exemption was to provide a greater remedy for those workers injured in power press accidents. (*Id*. at p. 288.) Thus, *Rosales* held that injuries suffered while operating a lathe using a sharp-edge cutting tool were not, as a matter of law, within those injuries contemplated by the Legislature when enacting section 4558. (*Rosales*, at pp. 286-288.)

The *Rosales* court rejected importing the definition of "power press" promulgated by the Occupational Safety and Health Standards Board (Cal. Code Regs., tit. 8, § 4188, subd. (b)) into section 4558. (*Rosales*, *supra*, 22 Cal.4th at p. 286.) "The Occupational Safety and Health Standards Board is not charged with enforcing section 4558's exception to workers' compensation exclusivity. Nor was that board's definition of power press promulgated under the authority of section 4558 or as a purported interpretation of that statute . . . . In any event, section 4558 provides its own definition of 'power press'—a definition that limits the category to machines using dies." (*Ibid.*)

4. *Definition of "Point of Operation Guard" on a Power Press*

The term "point of operation guard" appears in three definitions of section 4558, but is not statutorily defined.[5] In *Bingham v. CTS Corp.* (1991) 231 Cal.App.3d 56 (*Bingham*), the court held that the term " 'point of operation guard' as used in Labor Code section 4558 includes any apparatus or device that keeps a worker's hands outside the point of operation while operating a power press." (*Id*. at p. 59, fn. omitted.) The focus of the *Bingham* court was on the definition of "guard," as used in section 4558.

---

[5] Section 4558, subdivision (a)(2) provides: " 'Failure to install' means omitting to attach a *point of operation guard* either provided or required by the manufacturer, when the attachment is required by the manufacturer and made known by him or her to the employer at the time of acquisition, installation, or manufacturer–required modification of the power press." (Italics added.) Subdivision (a)(5) provides: " 'Removal' means physical removal of a *point of operation guard* which is either installed by the manufacturer or installed by the employer pursuant to the requirements or instructions of the manufacturer." (Italics added.) Subdivision (a)(6) provides: " 'Specifically authorized' means an affirmative instruction issued by the employer prior to the time of the employee's physical injury or death, but shall not mean any subsequent acquiescence in, or ratification of, removal of a *point of operation safety guard*." (Italics added.)

11

a. *"Guard" on a Power Press Protects Workers' Hands*

In *Bingham*, *supra*, 231 Cal.App.3d 56, the jury was instructed that " '[t]he word "guard" as used in California Labor Code section 4558 means, "any device or apparatus that prevents injury, damage or loss; an attachment or covering put on a machine to protect the operator." ' " (*Id*. at p. 62.) In concluding the trial court did not err, the *Bingham* court adopted a narrower definition of the term "guard." A guard must keep a worker's hands outside the point of operation. (*Id*. at pp. 62-65; see CACI No. 2804 Removal or Noninstallation of Power Press Guards—Essential Factual Elements (Lab. Code, § 4558) ["A 'guard' is any device that keeps a worker's hands or other parts of the body outside the point of operation"].)

Two such devices met the *Bingham* court's definition of guard; dual palm buttons and a light curtain. (*Bingham v. CTS Corp.*, *supra*, 231 Cal.App.3d at p. 65.) These guards were designed to render the power press inoperable whenever the worker was required to manually place the material in the die area. (*Id*. at pp. 66-67.)

b. *"Point of Operation Guard" Protects Workers' Hands in the Die Space*

The "point of operation" on a power press is where the die impart shape to the material by impact or pressure. (*Rosales*, *supra*, 22 Cal.4th at pp. 284-285.) A "guard" for purposes of section 4558 includes "any apparatus or device that keeps a worker's hands outside the point of operation while operating a power press." (*Bingham*, *supra*, 231 Cal.App.3d at p. 59.) Thus, a point of operation guard on a power press is: Any apparatus or device that keeps a worker's hands or other body parts outside of the area where the die shapes material by impact or pressure while the worker is operating the power press.

Limiting the definition of "point of operation guard" to the area where the die forms the material on a power press is consistent with the legislative purpose in enacting section 4558. "[T]he Legislature was free to assume that the need for protection was 'most evident' in the case of power presses which utilize dies. The Legislature could properly conclude that those machines *uniformly* present a serious danger to workers when point of operation guards are removed, because they uniformly employ a powerful

12

pressing or stamping motion which can cause serious crush injuries. It is true that other large power machines might also present a similar degree of danger. However, the Legislature was not required to provide a similar exception to those machines." (*Graham v. Hopkins* (1993) 13 Cal.App.4th 1483, 1490, italics in original.)

Our construction of a "point of operation guard" in section 4558 is consistent with case law addressing the exception, without specifically defining the term "point of operation guard." These cases assume the "point of operation" is the die space where the material is formed by striking, pressing, or punching the material, which poses a serious risk of crush injuries.

Recently, Division Four of this court in *Gonzalez v. Seal Methods, Inc.*, *supra*, 223 Cal.App.4th 405, addressed whether removable safety blocks were point of operation guards, referring to the point of operation as the "strike zone." (*Id*. at p. 408.) The safety blocks are small wooden or metal blocks that were placed at the point of operation to physically prevent the machine from striking whenever the operator's hands were in the point of operation. (*Ibid*.) The power press "was equipped with a two-hand activator system for operation in manual mode; the die would not strike unless the operator used both hands to press buttons located outside the strike zone (the 'point of operation'). The purpose of this two-hand activator system was to ensure that the operator's hands were outside the point of operation during the machine stroke." (*Ibid*.) Relying on the statutory language and the purpose of section 4558, the *Gonzalez* court concluded that unlike the two-hand activator system, the safety blocks were not point of operation guards because they were not permanently attached to the power press, and therefore the employer could not "knowingly remove" or "knowingly fail to install," these safety devices for purposes of section 4558. (*Gonzalez*, at pp. 410-412.)

In *Mora v. Hollywood Bed & Spring*, *supra*, 164 Cal.App.4th 1061, the plaintiff contended the power press that crushed his arm lacked an adequate guard to protect against injury at the point of operation. (*Id*. at p. 1064.) Although we addressed the requirements in section 4558 concerning whether the employer "specifically authorized" the knowing removal of, or knowing failure to install, a point of operation guard, our

discussion was based on the premise that the point of operation guard on a power press "protect[s] against an intrusion into the point of operation, meaning the area where the pressing takes place, when the pressing apparatus was in motion." (*Mora*, at p. 1064.)

In *Bingham*, *supra*, 231 Cal.App.3d 56, the power press at issue reformed metal by use of a 12-foot ram that the press brake operator fitted with various dies called "punches." The ram moved the fitted punch through a 10-inch space to a "V" shaped die in the bed of the machine to change the shape of metal pieces between the dies. (*Id*. at p. 59.) The safety devices (dual palm buttons and light curtains) were installed on the power press to protect the worker's hands from "the point of operation whenever the ram is capable of descending." (*Id*. at p. 65.)

Implicit in *Gonzalez*, *Mora*, and *Bingham*, is that the type of injury excluded from the workers' compensation system in section 4558 arises from the inherent danger to hands and other body parts at the point in which the die shapes the material in the absence of guards or safety devices. Were we to conclude that any industrial injury arising from operating a power press is within the section 4558 exception, we would disregard the Legislature's careful drafting of the statute.

At our request, the parties have submitted legislative materials for our review. These materials simply confirm that section 4558 was part of a broad overhaul of the workers' compensation system.[6] (See *LeFiell I*, *supra*, 55 Cal.4th at p. 286.) The legislative materials we have reviewed provide no meaningful insight regarding the definition of "point of operation guard." The Legislature's failure to specifically define this term, however, is understandable as a power press is statutorily defined by its operation.

### c. *Watrous's Definition Ignores the Type of Injury Exempted*

To support his definition of a point of operation guard, Watrous relies on safety regulations. Watrous defines "point of operation guard" as any device or guard that protects workers from serious injury resulting from exposure to the power press

---

[6]     We grant LeFiell's request for judicial notice.

mechanisms while shaping the material. Applying this broad definition, Watrous contends the door on the Fenn 5F swaging machine is a point of operation guard. Watrous's definition is inconsistent with the legislative purpose in enacting section 4558.

Like the *Rosales* court, we reject Watrous's attempt to import general industry safety regulations into section 4558. (See *Rosales*, *supra*, 22 Cal.4th at p. 286.) The regulations Watrous cites were not promulgated under the authority of section 4558, and generally refer to "a machine," and not specifically to a power press. Moreover, neither the plain language of section 4558 nor case law construing the exception indicates the Legislature intended to incorporate any industry specific definitions of "point of operation guard." As our Supreme Court noted in *LeFiell I*, section 4558 reflects the Legislature's careful drafting of the terms triggering the exception. (*LeFiell I*, *supra*, 55 Cal.4th at p. 286.)

Even were we to consider the definition of a "point of operation" in the general safety regulations, it does not support Watrous's broad construction of section 4558. A "point of operation" is defined as "[t]hat part of a machine which performs an operation on the stock or material and/or that point or location where stock or material is fed to the machine. A machine may have more than one point of operation." (Cal. Code Regs., tit. 8, § 4188, subd. (a).) As we have explained, the "operation" on a power press is where the die shapes the material. The use of a die, and the associated hazards of operating machinery that use a die to shape material by striking, pressing, or punching, is the basis for the section 4558 exception. Only those injuries suffered as a result of the knowing removal of, or knowing failure to install, a guard or device at the point where the die shapes the material are covered under section 4558.

Relying on federal regulations, Watrous contends that a "guard" includes any barrier that prevents entry of the workers' hands or fingers into the point of operation, which would include the door on the Fenn 5F swaging machine. (See 29 C.F.R. § 1910.211(d)(32) (2014).) Watrous reads "barrier" as any device. The regulation, however, refers to a "barrier" that prevents entry of the operator's hands and fingers at the point of operation. This is consistent with the legislative intent in enacting section

15

4558. The Legislature appears to have been focused on preventing injuries from a powerful pressing, punching, stamping, or striking motion when the die shapes the material while the worker is operating the power press, not any injury associated with operating the power press.

#### d. *The Door Was Not a Point of Operation Guard*

Based on this analysis, the door on the Fenn 5F swaging machine was not a point of operation guard. The purpose of the door was to keep the dies in place and provide access to the dies, not to keep Watrous's hands or other parts of his body outside the point of operation when the dies shaped the material. The dies were in the bed of the machine "several inches inboard from the door's front face," and approximately six feet away from where Watrous was operating the machine.

Watrous's injury occurred away from the space where the dies shape the material when he was hit by a metal object while operating the power press. He was removing a part from the machine and believes the part struck the exposed bolts and clamps on the pressure plate assembly. The door may have protected Watrous from dangers posed by protruding bolts and clamps on the rotating pressure plate assembly, but the door did not guard the point of operation where the dies shape the material. Thus, any claim arising from Watrous's injury is governed by the exclusivity of the workers' compensation laws. (§ 3600 et seq.) Accordingly, the trial court erred in denying LeFiell's motion for summary judgment.

16

DISPOSITION

The petition is granted.  Let a peremptory writ of mandate issue directing the trial court to vacate its order denying LeFiell's motion for summary judgment and enter a new and different order granting the summary judgment motion.  The stay of proceedings in the trial court is lifted.  Each party is to bear its respective costs in this writ proceeding.

**CERTIFIED FOR PUBLICATION**

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.

17